No. 76,025

BARRY L. SMITH, Administrator of the Estate of Glen C. Smith, deceased, *et al.*, *Appellants/Cross-appellees,* v. ALBERT PRINTUP, SOUTHWEST MOVERS, INC., THE HARTFORD ACCIDENT & INDEMNITY COMPANY, and AMERICAN STATES INSURANCE COMPANY, *Appellees,* and AMERICAN RED BALL TRANSIT COMPANY, INC., *Appellee/Cross-appellant,* and KANSAS TURNPIKE AUTHORITY, MYERS CONSTRUCTION COMPANY, and ALLIED LABORATORIES, *Defendants.*

(938 P.2d 1261)

Opinion filed June 6, 1997.

*Randall E. Fisher*, of Law Offices of Randall E. Fisher, of Wichita, argued the cause and was on the briefs for appellants/cross-appellees.

*Stephen M. Kerwick*, of Foulston & Siefkin, L.L.P., of Wichita, argued the cause, and *Jay F. Fowler*, of the same firm, was with him on the brief for appellee/cross-appellant American Red Ball Transit Company, Inc.

*Randy J. Troutt*, of Kahrs, Nelson, Fanning, Hite & Kellogg, L.L.P., of Wichita, argued the cause, and *Vince P. Wheeler*, of the same firm, was on the brief for appellees Southwest Movers, Inc., and American States Insurance Co.

The opinion of the court was delivered by

DAVIS, J.: This is the second appeal involving punitive damages awarded to the estate of Glen C. Smith, deceased, brought by the administrator, plaintiff Barry L. Smith, *et al.* (Smith). In *Smith v. Printup*, 254 Kan. 315, 866 P.2d 985 (1993), we remanded this case with instructions. This appeal basically involves two questions: (1) whether reversible error occurred during the remand proceeding to determine if defendant Southwest Movers, Inc., (Southwest) authorized or ratified the wanton conduct of its employee, defendant Albert Printup; and (2) whether the trial court erred in reas-

sessing punitive damages against defendants American Red Ball Transit Company, Inc., (Red Ball) and Printup. We conclude that no reversible error occurred and affirm.

The facts giving rise to the underlying claims in this action are set forth in *Smith v. Printup*:

"Near midnight on September 15, 1987, defendant Albert Printup was driving a moving van southeast in the right lane on the Kansas Turnpike near the Andover exit. He lost control of the van, jackknifed, crossed the median, and collided with a pickup truck operated by Carolyn S. Elliott. Glen C. Smith was a passenger in the pickup driven by Ms. Elliott. As a result of the collision, Ms. Elliott died instantly. Mr. Smith suffered massive chest and other severe injuries but had a pulse and was breathing and groaning after impact. He died at the scene. Albert Printup survived.

"Albert Printup was employed by Southwest Movers, Inc. (Southwest). He was paid a flat salary, with no bonuses for extra hours or miles. At the time of the accident, he had been 'leased out' to American Red Ball Transit Company, Inc., (Red Ball) for the last four to five years. He had not driven for anyone else during that period of time. Red Ball dispatched him, and he turned in his shipping documents and driving logs to Red Ball. He turned in his expense receipts to Southwest for reimbursement.

"Plaintiffs sued Printup, Southwest, and Red Ball for wrongful death and, with respect to Mr. Smith, for pain and suffering. The court allowed the Smith plaintiffs to amend their complaint to seek punitive damages in accordance with K.S.A. 1992 Supp. 60-3703 against Southwest, Printup, and Red Ball in conjunction with their survivor action. The court ruled that punitive damages were not recoverable in the wrongful death actions.

"From the very beginning, plaintiffs challenged the constitutionality of K.S.A. 1992 Supp. 60-3701. The trial court rejected this contention and found the statute to be constitutional. On summary judgment, the trial court rejected plaintiffs' claim that they were entitled to punitive damages based on the allegation that Southwest and Red Ball negligently hired, retained, supervised, and trained Albert Printup. The court allowed Smith to present punitive damage claims against the corporate defendants, but, in accordance with K.S.A. 1992 Supp. 60-3701(d)(1), only to the extent that the corporate defendants authorized or ratified Printup's conduct. The jury determined that punitive damages should be awarded against Printup and Red Ball, but not against Southwest. The court awarded punitive damages in the amount of $20,000 against Printup and $100,000 against Red Ball." 254 Kan. at 318-19.

Additional facts from our first opinion and new facts developed upon remand are set forth in the discussion of the alleged errors raised in this second appeal. In the first appeal, a majority of this

court reached the following conclusions and remanded the case for further proceedings:

"The judgment of the court is affirmed in the following particulars. K.S.A. 1992 Supp. 60-3701 is constitutional. Punitive damages are not available in a wrongful death action in Kansas. After the enactment of K.S.A. 1992 Supp. 60-3701 *et seq.*, a plaintiff has no right to advance a separate claim for punitive damages against an employer or principal based upon negligent acts of the employer or principal in hiring, supervising, training, or retaining the employee/agent.

"The court's rulings regarding the admission of financial records to determine the amount of punitive damages are affirmed, and those rulings become the law of the case upon remand. Likewise, the court's rulings regarding the admission of evidence of remedial conduct together with evidence of settlement negotiations are affirmed and become the law of the case upon remand.

"The court's holding that joint and several liability is not available under the provisions of K.S.A. 1992 Supp. 60-3701(b), (e), and (f) is affirmed. The court's holding that treble damages under K.S.A. 66-176 are unavailable in this case is affirmed and becomes the law of the case upon remand. Finally, the court correctly determined that there was sufficient evidence to submit to the jury the plaintiffs' claim of conscious pain and suffering on behalf of Smith and the issue of wantonness of Printup's conduct.

"The court erroneously excluded relevant evidence of authorization or ratification under the provisions of K.S.A. 1992 Supp. 60-3701(d)(1) that affected the substantial rights of the plaintiffs. The court also committed clear error by failing to instruct the jury on authorization under 60-3701(d)(1). Accordingly, the decision regarding punitive damages is reversed, and the case is remanded with the following directions:

"(1) Upon remand, a jury will be required to determine, under the guidelines set forth in this opinion, whether punitive damages should be awarded against Southwest.

"(2) The jury determination that punitive damages should be awarded against Red Ball and Printup is affirmed, and the jury shall not consider this issue.

"(3) The court's determination of the amount of punitive damages against Red Ball and Printup is reversed.

"(4) After a jury has determined whether Southwest shall be assessed punitive damages, the court may be required to determine the amount, if any, of punitive damages to be awarded against Southwest consistent with this opinion.

"(5) The court will be required to determine the amount of punitive damages to be assessed against Red Ball and Printup consistent with this opinion." 254 Kan. at 359-60.

Consistent with this court's direction on remand, the issue of Southwest's liability for punitive damages on the basis of authorization and ratification was tried to a jury. This trial resulted in a

mistrial. Soon after the declaration of a mistrial, Smith moved to disqualify the judge on the grounds of bias and prejudice. This motion was denied. In the second retrial, the jury ruled in favor of Southwest.

The trial court also conducted a hearing to redetermine the amount of Smith's punitive damages against Red Ball and Printup consistent with our opinion in *Smith v. Printup*, 254 Kan. at 360. At the conclusion of this hearing, the court increased the punitive damage award against Printup from $20,000 to $20,800 and took the matter of the punitive damage award against Red Ball under advisement. Thereafter, the trial court awarded Smith $100,000 in punitive damages against Red Ball, the same amount awarded in *Smith v. Printup*, 254 Kan. at 319.

## ISSUES ON APPEAL

Smith claims that the trial court refused to follow the directions of this court upon remand (1) by refusing to admit certain evidence on the issue of whether Southwest authorized or ratified Printup's conduct; (2) by assessing the same amount of punitive damages upon remand against Red Ball that were awarded in the first trial; and (3) by assessing the amount of punitive damages against Printup under the provisions of K.S.A. 60-3701(e) instead of K.S.A. 60-3701(f). Smith also contends that the court erred in not granting his motion to disqualify the trial judge. Red Ball cross-appealed in the event that we remand again for reassessment of its punitive damages. Since we do not remand, we need not address Red Ball's cross-appeal.

## 1. Admission of Evidence on Whether Southwest Movers Authorized or Ratified Printup's Conduct

In *Smith v. Printup*, we remanded for a jury determination whether punitive damages should be awarded against Southwest. We did so on the basis that: "[t]he court erroneously excluded relevant evidence of authorization or ratification under the provisions of K.S.A. 1992 Supp. 60-3701(d)(1) that affected the substantial rights of the plaintiffs." 254 Kan. at 360.

Smith advances four arguments in support of his contention that the trial court erroneously excluded evidence which demonstrated that the "questioned conduct [of Printup] was authorized or ratified by a person expressly empowered to do so on behalf of the . . . employer [Southwest]." K.S.A. 60-3701(d)(1). Smith argues (a) that the district court excluded relevant evidence in its ruling on Southwest's motion in limine; (b) that despite the rulings made on the motion in limine, Southwest opened the door on the evidence previously excluded, thereby making such evidence admissible; (c) that the trial court improperly restricted the testimony of John Neal, an expert witness for Smith; and (d) that the trial court improperly restricted the questioning of Ron Davis, owner of Southwest.

## Standard of Review

Before addressing the four arguments, we must first determine our standard of review. Smith's arguments involve the admissibility of evidence at trial. The standard of review applied to questions involving the admissibility of evidence at trial is one of abuse of discretion. *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, 626, 822 P.2d 591 (1991). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 804, 897 P.2d 123 (1995).

Smith argues that the standard in this case should be a question of law because we have previously reviewed the matter and instructed the trial court what evidence should be admitted on retrial. However, this argument ignores our actual rulings regarding admissibility of evidence upon retrial. Far from identifying specific evidence that was to be admitted or excluded upon remand, this court defined the terms "authorization" and "ratification" contained in K.S.A. 60-3701, identified broad categories of relevant evidence that relate to authorization and ratification, and required for admissibility a causal connection between the evidence offered and accident. *Smith v. Printup*, 254 Kan. at 342, 344-46. Questions

of admissibility upon retrial rested with the trial court. The standard applied during this appeal remains one of abuse of discretion.

### a. Evidence Excluded By Motion in Limine

Smith argues that the trial court erred in granting the following portions of Southwest's motion in limine:

"Southwest . . . moves the Court for an order in advance of trial prohibiting the parties, their counsel, or any witnesses from mentioning in the presence of the jury any of the following:

. . . .

"4 That Southwest Movers, including any of its employees, failed to properly inspect or maintain any of its vehicles, either before or after the accident giving rise to this lawsuit, including Southwest Movers' vehicle involved in such accident.

. . . .

"6 That any drivers employed by Southwest Movers, other than defendant Albert Printup, either before or after the accident giving rise to this lawsuit, have been cited for any state, federal or company policy violations, or have been involved in any motor vehicle accident, or committed any act reflecting on their fitness to operate a motor vehicle.

. . . .

"12 Any line of questioning as to 'what it took' to stop what Albert Printup was doing in terms of his driving or logging . . . ."

In *Smith v. Printup*, we concluded that falsification of maintenance records was not admissible:

"The trial court did not err in excluding evidence that Printup falsified vehicle inspection reports because there was no evidence in the record that a mechanical problem caused or contributed to the accident. Officer Joy specifically testified that he did not find any mechanical defects in Printup's truck that caused or contributed to the accident. . . . Absent any causal relationship between inadequate inspections and the accident, evidence of such violations is not relevant or admissible." 254 Kan. at 346.

While Smith sought to admit this evidence as a course of conduct contributing to Printup's falsification of logs which resulted in his fatigue, the trial court found no causal connection and excluded the evidence. Based upon our earlier ruling and the reasons for exclusion upon remand, we find no abuse of discretion.

We also directly addressed in *Smith v. Printup* evidence relating to other drivers for Southwest:

"Evidence about other drivers' conduct is not pertinent to ratification or authorization of Printup's conduct unless the other drivers' conduct is related to fatigue-causing conditions. The companies' tolerance of false logs and hours of service violations is evidence from which the jury could infer that the companies were sending a message to Printup and other drivers that such conduct was acceptable. The jury could infer that the companies authorized or ratified such conduct. Similarly, the trial court erred in excluding evidence about Southwest's recordkeeping practices to the extent the evidence pertained to driving logs or hours of service and thus driver fatigue." *Smith v. Printup*, 254 Kan. 346-47.

A determination of whether the falsification of logs and other legal violations by other Southwest drivers is related to fatigue-causing conditions depends upon the evidence. In support of his argument, Smith makes reference to the plaintiffs' exhibits 43 & 45A. These exhibits are not included in the record on appeal. " 'Assertions in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal.' " *Smith v. Printup*, 254 Kan. at 353.

Smith contends that the trial court erroneously excluded evidence that Southwest failed to discipline Printup when it learned he had another accident in Carbondale, Illinois, while his logs showed he was off duty. The trial court also excluded evidence that Southwest took no disciplinary action to terminate Printup until after this accident. The trial court excluded this evidence primarily for lack of causation. In responding to the evidence relating to the Carbondale accident, the court said: "If the jury could find that fatigue due to hours of service caused or contributed to the accident, and evidence the company knew of Printup's false logs and hours of service violations, it is relevant to the authorization." There was no evidence to connect the event to this accident. We do not believe the exclusion was an abuse of discretion.

b. Opening the Door

Smith argues that Southwest's opening statement and testimony from owner Ron Davis painted the picture that Southwest had no reason to violate the law and that it would not violate the law or permit its drivers to violate the law. Southwest responds that its opening statement and questions of Davis addressed only the issue of whether Southwest had knowledge of and approved of Printup's

recordkeeping practices and hours of service violations. While Smith's argument presents a close question, we are not prepared to say that the trial court abused its discretion by adhering to its earlier ruling excluding this same evidence upon Southwest's motion in limine. We are not able to say that the exclusion was arbitrary, fanciful, or unreasonable.

### c. Plaintiff's Expert Testimony

Smith alleges that the trial court impermissibly restricted the testimony of his expert witness, John Neal. Neal was qualified as a consultant to attorneys on heavy truck and bus accident cases. His testimony covers almost 100 pages of the record. His qualifications, as recounted before the jury, related to large trucking and busing concerns. After much discussion between counsel and the court outside the presence of the jury, the trial court sustained Southwest's objections to opinion evidence by Neal. The court ruled:

"The questions precipitated voir dire of the witness and so on had to do and started out with whether Mr. Neal was familiar with the standards of practice with respect to a company the size of Southwest Movers. In other words, mom and pop or mother and son business as to how they handled these things. Mr. Neal's experience has been purely with a large company, he has no experience to render an opinion about how Southwest Movers should have acted according to the industry standard of a company similar in size who operates on an agency agreement."

After this ruling, Smith attempted to advance Neal's additional qualifications to testify about smaller companies. The court responded:

"Just a minute now. We went through voir dire to qualify this witness as to the safety practices of the company the size of Southwest Movers. I made a ruling. No request was made for additional evidence to qualify the witness, and you cannot now qualify him on this matter."

"The qualifications of an expert witness and the admissibility of his testimony are within the sound discretion of the trial court." *Evans v. Provident Life & Accident Ins. Co.*, 249 Kan. 248, 259, 815 P.2d 550 (1991). We do not believe that an abuse of discretion has been established with regard to the exclusion of the above evidence.

#### d. The Trial Court's Restriction of the Plaintiff's Questioning of Ron Davis, Owner of Southwest

Smith argues that the court sustained objections to his questions to Davis and impaired his ability to develop Southwest's authorization or ratification of Printup's conduct. Smith points to a series of questions asked during 4 of the 58 pages of counsel's direct examination. Our consideration of the entire direct examination demonstrates that counsel developed Smith's theory of authorization or ratification by showing, among other things, that Southwest took no action against Printup despite the many hours of service violations he received throughout the summer prior to the accident. Smith fails to establish an abuse of discretion on the part of the trial court.

### 2. Amount of Punitive Damages Assessed Against American Red Ball

The punitive damages assessed against Red Ball on remand were $100,000, the same amount assessed in the earlier proceeding. Smith asks that we reverse and remand because the trial court (1) ignored the new evidence regarding Red Ball's authorization or ratification of Printup's conduct admitted pursuant to our opinion in *Smith v. Printup*; (2) failed to follow the provisions of K.S.A. 60-3701(b); and (3) improperly considered one victim's financial status and both victims' character.

#### Standard of Review

Prior to the enactment of K.S.A. 60-3701 and 60-3702, which places the calculation of the amount of punitive damages with the trial court instead of a jury, we applied an abuse of discretion standard when reviewing a punitive damages award. See *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 77, 755 P.2d 1319 (1988). In *Gillespie v. Seymour*, 253 Kan. 169, 172-73, 853 P.2d 692 (1993) (*Gillespie II*) (quoting *Henderson v. Hassur*, 225 Kan. 678, 694, 697, 594 P.2d 650 [1979]), we noted the change brought by the enactment of K.S.A. 60-3701:

"The enactment of K.S.A. 1992 Supp. 60-3701 (and its companion K.S.A. 1992 Supp. 60-3702) represents a substantial change in the award of punitive damages in Kansas. Prior thereto, the trier of fact determined the amount of damages based

upon rather nebulous factors. Appellate review thereof was limited. We stated the general rules relative to punitive damages in *Binyon v. Nesseth*, 231 Kan. 381, 386, 646 P.2d 1043 (1982), as follows:

'An appellate court will not find a punitive damage award excessive unless it is of a size to shock the conscience of the appellate court. [Citation omitted.]. . . .

"It is difficult, if not impossible, to lay down precise rules by which to test the question of when a verdict for punitive damages is excessive. [Citation ommitted.] Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs. [Citation omitted.] The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. [Citation omitted.] In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses. [Citations omitted.]' "

"Under K.S.A. 1992 Supp. 60-3701, a bifurcated proceeding is established. The trier of fact determines if punitive damages should be awarded. The court, in a separate proceeding, then establishes the amount thereof. A substantial list of factors is set forth in the court's consideration in determining the amount of the award."

Subject to the provisions of K.S.A. 60-3701, the standard of review remains one of abuse of discretion. We must first determine whether the provisions of K.S.A. 60-3701 have been applied by the trial court in setting the amount of punitive damages. Once that determination has been made, the amount awarded will be set aside only upon a showing that the trial court abused its discretion, which is another way of saying that the action of the trial court was arbitrary, capricious, or unreasonable. See *Ensminger v. Terminix Intern. Co.*, 102 F.3d 1571 (10th Cir. 1996). We also have stated that "[w]hen determining the amount of punitive damages to be awarded under K.S.A. 1992 Supp. 60-3701, it is incumbent on the trial court to make sufficient findings of fact to afford meaningful appellate review thereof." *Gillespie II*, 253 Kan. 169, Syl.

### a. The Trial Court's Consideration of Evidence Related to Authorization or Ratification

Upon remand, additional evidence excluded at the first trial was admitted. The evidence admitted supported Smith's theories that punitive damages should have been assessed against Red Ball because it had an attitude, pattern of practice, and mental state of mind which showed disregard, indifference, and defiance for federal safety rules and regulations and the safety of the public. The following new evidence was admitted: The transcript of deposition of Roberta Sisson, past employee of Red Ball who audited drivers' logs and log violations; transcript of deposition of Paul Nahre, Director of Safety for Red Ball; transcript of deposition of Chris Heiner, past employee of Red Ball; the transcript of deposition of Cheryl Riley, past safety coordinator of Red Ball; Red Ball's driver file for Southwest's driver Albert Printup; and Red Ball's safety audit file and correspondence concerning logging procedures.

Smith acknowledges that the trial court permitted the introduction of the evidence of wrongdoing on the part of Red Ball and Printup prior to November 8, 1983, which had been excluded at the first trial. However, Smith argues that the court completely disregarded the impact of this evidence. Smith argues that if this court in *Smith v. Printup* believed that the additional evidence would not have had the effect of raising punitive damages by at least one cent, it would have found the error to be harmless.

Smith misreads our decision in *Smith v. Printup*. We concluded that the evidence excluded was relevant and admissible on the issues of ratification or authorization. The trial court's exclusion of relevant and admissible evidence affected the substantial rights of the plaintiffs. 254 Kan. at 347. We did not express an opinion upon the effect such evidence would have had if it had been admitted. Our decision simply said that Smith should be given the opportunity to present such evidence and that its exclusion was prejudicial. We held:

"The exclusion of evidence [relating to Red Ball's ratification and authorization of drivers' fatigue-causing conditions] also affected the substantial rights of plaintiffs as to the court's determination of the amount of punitive damages. The punitive damages awards against Red Ball and Printup are reversed and remanded

for further consideration by the court. While the excluded evidence relates to authorization and ratification, it also relates to the conduct of Printup and Red Ball. With new evidence, a determination of the amount of punitive damages against these two defendants *may* change." (Emphasis added.) *Smith v. Printup*, 254 Kan. at 347.

In its memorandum decision awarding the punitive damages, the trial court considered the new evidence but decided "that the additional evidence does not change the Court's decision as to the amount of punitive damages awarded" against Red Ball. The court further concluded:

"American Red Ball is liable because it ratified the actions of Printup. It will almost be impossible to prove a case of actual authorization of any person to act wantonly. American Red Ball is liable for punitive damages because of its actions in allowing Printup to drive in violation of the hours of service rules, therefore, it ratified the acts of Printup. In other words, American Red Ball is being assessed punitive damages because of its own conduct."

After indicating that it considered the statutory factors in K.S.A. 60-3701(b), the trial court concluded:

"[T]he additional evidence does not change the Court's decision as to the amount of punitive damages awarded. This decision is made for the best interest of justice. It is far better that a smaller award of punitive damages be paid rather than a large award that is unpaid. The matter of re-computing this award has been constantly on the mind of the Court since the issuance of the opinion of the Supreme Court. This award is based on a desire to do justice to the parties."

Smith relies on the *Gillespie* cases for authority that the trial court erred. *Gillespie v. Seymour*, 255 Kan. 774, 877 P.2d 409 (1994); *Gillespie II*, 253 Kan. 169; and *Gillespie v. Seymour*, 250 Kan. 123, 823 P.2d 782 (1991) (*Gillespie I*). These cases involved the same trial judge who presided in this case. The issue involved in the *Gillespie* cases was the question of profitability as related to the statutory caps on punitive damages provided in K.S.A. 60-3701(e) and (f). In *Gillespie II*, we were primarily concerned with the method whereby the trial court calculated the amount of profitability of the defendant's misconduct pursuant to 60-3701(f). 253 Kan. at 170-72. While in *Gillespie II* this court examined an award that was identical to the original award appealed in *Gillespie I*, the primary reason for the second remand to the district court was due

to the lack of a meaningful record for this court to review. 253 Kan. at 174.

In this case, the findings and conclusions of the trial court are set forth in its memorandum decision. It is obvious that the trial court considered the new evidence and for reasons set forth in its opinion assessed the same amount of punitive damages. Our decision in *Smith v. Printup* contemplates such action by its use of the discretionary language "may change." 254 Kan. at 347. The trial court in this case considered the new evidence as well as the factors set forth in K.S.A. 60-3701(b). We conclude that Smith has failed to establish an abuse of discretion on the part of the trial court in reassessing the punitive damage award against Red Ball.

b. The Trial Court's Consideration of Statutory Factors

K.S.A. 60-3701(b) provides the following guidance to a trial court assessing punitive damages:

"(b) At a proceeding to determine the amount of exemplary or punitive damages to be awarded under this section, the court may consider:

(1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;

(2) the degree of the defendant's awareness of that likelihood;

(3) the profitability of the defendant's misconduct;

(4) the duration of the misconduct and any intentional concealment of it;

(5) the attitude and conduct of the defendant upon discovery of the misconduct;

(6) the financial condition of the defendant; and

(7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected."

Smith argues that he presented evidence directly relevant to subsections (1), (2), and (4) above. However, he insists that the trial court focused instead on the conduct of the victims and their attorneys. Further, he asserts that the trial court ignored the substantial amount of attorneys' fees accrued by the plaintiffs and heavily weighed the plaintiffs' opportunities to settle the case.

Punitive damages are in the nature of an equitable action. *Smith v. Printup*, 254 Kan. 315, Syl. ¶ 7. The trial court must weigh the evidence presented to arrive at an award. In this case, the court

carefully considered the provisions of K.S.A. 60-3701(b)(1)-(7). While the court does not make explicit the facts it found relevant for each factor, see *e.g., Patton v. TIC United Corp.*, 859 F. Supp. 509 (D. Kan. 1994), *aff'd* 77 F.3d 1235 (10th Cir.), *cert. denied* 135 L. Ed. 2d 1049 (1996), it is clear that the decision was made with the statutory provisions in mind.

The trial court directly addressed the question of attorney fees:

"Attorney fees are costs that can be considered in assessing punitive damages. The court considers that defendants would at all times been willing to settle the survival action for the amount of the jury verdict and that the time and expense in the cases involved matters other than the wrongful death action."

In *Smith v. Printup,* we authorized evidence concerning litigation expenses to become the law of the case upon remand, stating: "Likewise, the court's rulings regarding the admission of evidence of remedial conduct together with evidence of settlement negotiations are affirmed and become the law of the case upon remand." 254 Kan. at 359.

Probable litigation expenses have long been considered a factor in awarding punitive damages.

"An award of punitive damages must be reviewed in the light of the actual damages sustained, the actual damage award, the circumstances of the case (the nature, extent, and enormity of the wrong), the intent of the party committing the wrong, the relative positions of the plaintiff and the defendant, the defendant's financial worth, and *the plaintiff's probable litigation expenses*. When reviewing punitive damages, any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages." (Emphasis added.) *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 366, 837 P.2d 330 (1992).

In this case, the trial court was in a unique position to make its determination regarding settlement and the plaintiffs' probable litigation expenses. We find no abuse of discretion in the trial court's determination not to include the plaintiffs' litigation expenses in determining the amount of the award against Red Ball.

### c. The Trial Court's Consideration of the Victim's Financial Status and Character

The trial court included the following paragraph in its memorandum decision:

"In the old days, when a jury assessed punitive damages, the jury considered all of the evidence, including the evidence about the person seeking damages, in making its award. A court in assessing punitive damages cannot do less. Glen Smith was a highway Patrolman assigned to the Kansas Turnpike. Based on the evidence in the case, Glen Smith was much more in debt [than] any law enforcement officer should be, and especially not, the premier uniformed law enforcement agency of the state. In addition, Smith had been subject to wage withholding orders for failure to pay alimony and child support. While hearing the retrial of the matters involving Southwest Movers, the court aide called the Court's attention that the other person (Glen Smith's 'housemate') killed in the crash was the court aide's probationer at the time of [the] accident. (See Case No. 87 CR 519.) (The case is not evidence the Court can consider.)"

Smith argues that this evidence is immaterial to the calculation of punitive damages. We agree.

Kansas law supports a conclusion that evidence of a victim's financial status or character, as mentioned by the trial court, is not relevant in a determination of the amount of punitive damages. While the relative financial positions of the plaintiff and the defendant may be considered, see *Cerretti*, 251 Kan. at 366; *Folks*, 243 Kan. at 78, and *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 420, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984), such consideration does not include personal characteristics of a plaintiff such as his or her debts, his or her living arrangements, or his or her status as a probationer.

The policy underlying the imposition of punitive damages supports the conclusion that the evidence of Glen Smith's debts or his character are not relevant. In *Smith v. Printup*, we said:

"Punitive damages are not given upon any theory that the plaintiff has any just right to recover them, but are given only upon the theory that the defendant deserves punishment for his or her wrongful acts and that it is proper for the public to impose them upon the defendant. No right of action for punitive damages is ever given to any private individual who has suffered no real or actual damage." 254 Kan. 315, Syl. ¶ 3.

As one commentator explains:

"Punitive damages may be contrasted with compensatory damages, special damages, contract damages, restitution, or equitable damages, which, in contrast to punitive damages, are measured by the difference in the position of the party after the wrong as compared to that party's position before the wrong. These compensatory, special, contract, restitution or equitable damages are not intended to im-

prove the position of the party injured or damaged as a practical consequence of their award.

"Indeed, punitive damages do not depend on the financial condition of the party wronged, but rather upon the financial wherewithal of the party at fault who has acted maliciously or oppressively. The amount of punitive damages is often said to be based upon the sum that is perceived to punish or to deter the offending conduct. That sum may depend upon the financial size and strength of the defendant, the degree of the community's outrage, and other factors. Punitive damages, accordingly, may enrich the recovering party, who obtains a windfall to the extent that he is placed in a better position than he enjoyed before the offensive conduct occurred." Blatt, *et al.*, Punitive Damages § 1.3(B) (1991).

The trial court erred in mentioning the information concerning the debts of Glen Smith and character evidence concerning Glen Smith and Elliott. However, an error which does not prejudice the substantial rights of a party affords no basis for reversal of a judgment and may be disregarded. *Tamplin v. Star Lumber & Supply Co.,* 251 Kan. 300, 308, 836 P.2d 1102 (1992).

The trial court memorandum decision contains one paragraph relating to the evidence erroneously considered. The remaining three pages deal with factors set forth in K.S.A. 60-3701 as well as other financial information relating to the ability of the defendants to pay such damages. The court says that it has carefully considered the provisions of K.S.A. 60-3701(b); Smith does not contend that these factors were not considered. Nor does Smith complain that the findings relating to these factors are inadequate. Nothing in the trial court's decision indicates that it based its determination upon the information found by this court to be erroneously considered. A reading of the entire memorandum decision supports the opposite conclusion. The memorandum decision viewed as a whole illustrates the trial court's primary concern about the financial condition of the defendants and their need and ability to pay such damages. Accordingly, we conclude that the error was harmless.

3. Refusing to Reassess the Amount of Punitive Damages Against Printup Under the Provisions of K.S.A. 60-3701(f)

Standard of review

Interpretation of a statute is a question of law. An appellate court's review of a question of law is unlimited. See *State v. Donlay,*

253 Kan. 132, 133-34, 853 P.2d 680 (1993). "When determining a question of law, this court is not bound by the decision of the district court." *Memorial Hospital Ass'n, Inc. v. Knutson*, 239 Kan. 663, 668, 722 P.2d 1093 (1986).

Smith argues that the trial court incorrectly assessed punitive damages against Printup because it failed to consider Printup's course of conduct prior to the accident. Smith points out that the exclusion of this evidence in the initial proceeding was the basis of this court's remand. Printup does not respond to this argument.

Smith points to the trial court's discussion of K.S.A. 60-3701(e) and (f) and suggests that the discussion demonstrates that trial court ignored course of conduct evidence. K.S.A. 60-3701(e) and (f) provide alternative methods for calculating the maximum punitive damages available:

"(e) Except as provided by subsection (f), no award of exemplary or punitive damages pursuant to this section shall exceed the lesser of:

"(1) The annual gross income earned by the defendant, as determined by the court based upon the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded; or

"(2) $5 million.

"(f) In lieu of the limitation provided by subsection (e), if the court finds that the profitability of the defendant's misconduct exceeds or is expected to exceed the limitation of subsection (e), the limitation on the amount of exemplary or punitive damages which the court may award shall be an amount equal to 1 ½ times the amount of profit which the defendant gained or is expected to gain as a result of the defendant's misconduct."

In discussing the above provisions, the trial court stated:

"[T]he Court advises the parties that it has reached a decision on the amount of punitive damages to be assessed against defendant Albert Printup, taking into consideration all the evidence admitted at trial and at the previous hearing on punitive damages. After duly considering the same, the Court finds that punitive damages should be assessed against defendant Albert Printup in the amount of $20,800, which is the most the Court believes it can assess against said defendant pursuant to K.S.A. 60-3701(e). The Court further finds that it does not believe K.S.A. 60-3701(f) applies to this case and, even if it did, it would award less punitive damages against this defendant than it has under K.S.A. 60-3701(e)."

Smith argues that subsection (f) is applicable to the present case because Printup profited from his course of conduct which was

proximately related to the accident. This conduct included falsifying log books and working too many hours in a day. Smith contends that had Red Ball been complying with the law, it would have fired Printup 4 years prior to the accident. Thus, Smith concludes that Printup profited from his violations by receiving continued employment. However, as the trial court noted upon remand, "I do not have any evidence that Mr. Printup would not have been working but for his violation of law." Printup did not profit from illegal conduct for 4 years, rather, he profited, if at all, from Red Ball's negligent supervision for the 4-year period prior to the accident. Under these facts, K.S.A. 60-3701(f) is inapplicable. We concluded that the trial court correctly applied the provisions of K.S.A. 60-3701(e).

## 4. Claimed Lack of Impartiality of Trial Court

After the district court declared a mistrial in the first retrial of Southwest's authorization or ratification of Printup's conduct, Smith filed a motion to disqualify the trial judge pursuant to K.S.A. 20-311d. He stated that the precipitating event to filing this motion was the judge's behavior upon hearing testimony of expert witness John Neal and his declaration of a mistrial.

The statute pursuant to which a motion for disqualification is filed states:

"(a) If a party or a party's attorney believes that the judge to whom an action is assigned cannot afford that party a fair trial in the action, the party or attorney may file a motion for change of judge. The motion shall not state the grounds for the party's or attorney's belief. The judge shall promptly hear the motion informally upon reasonable notice to all parties who have appeared in the case. If the judge disqualifies the judge's self, the action shall be assigned to another judge by the administrative judge. If the judge refuses to disqualify the judge's self, the party seeking a change of judge may file the affidavit provided for in subsection (b). If an affidavit is to be filed it shall be filed forthwith.

"(b) If a party or a party's attorney files an affidavit alleging any of the grounds specified in subsection (c), the administrative judge shall at once determine, or refer the affidavit to another district judge for prompt determination of, the legal sufficiency of the affidavit. If the affidavit is filed in a district court in which there is no other judge who is qualified to hear the matter, the administrative judge shall at once notify the departmental justice for the district and request the appointment of another district judge to determine the legal sufficiency of the af-

fidavit. If the affidavit is found to be legally sufficient, the case shall be assigned to another judge.

"(c) Grounds which may be alleged as provided in subsection (b) for change of judge are that:

"(1) The judge has been engaged as counsel in the action prior to the appointment or election as judge.

"(2) The judge is otherwise interested in the action.

"(3) The judge is related to either party to the action.

"(4) The judge is a material witness in the action.

"(5) The party or the party's attorney filing the affidavit has cause to believe and does believe that on account of the personal bias, prejudice or interest of the judge such party cannot obtain a fair and impartial trial or fair and impartial enforcement of post-judgment remedies. Such affidavit shall state the facts and the reasons for the belief that bias, prejudice or an interest exists.

"(d) In any affidavit filed pursuant to this section, the recital of previous rulings or decisions by the judge on legal issues or concerning the legal sufficiency of any prior affidavits filed by counsel for a party in any judicial proceeding, or filed by such counsel's law firm, pursuant to this section, shall not be deemed legally sufficient for any belief that bias or prejudice exists." K.S.A. 20-311d.

Smith alleges that K.S.A. 20-311d(c)(5) is applicable to the present case.

Upon Smith's motion, the trial judge decided not to disqualify himself. Pursuant to the statute, Smith filed a formal motion with the administrative judge. Counsel supported the motion with three affidavits, including several attachments. The administrative judge heard and denied the motion. He certified the issue for interlocutory appeal. However, there is no indication in the record on appeal that the ruling was appealed.

Standard of Review

In determining the sufficiency of an affidavit filed pursuant to K.S.A. 20-311d, we examine whether

"[t]he affidavit . . . state[s] facts and reasons, pertaining to the party or his attorney which, if true, give fair support for a well-grounded belief he will not obtain a fair trial. [Citations omitted.] The question of the sufficiency of the affidavit is one of law for the court to determine but '[p]revious adverse rulings of a trial judge, although numerous and erroneous, where they are subject to review, are not ordinarily and alone sufficient to show such bias or prejudice as would disqualify him as a judge.'" *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, 311, 607 P.2d 1339 (1980).

"The standard to be applied to a charge of lack of impartiality is:

'whether the charge of lack of impartiality is grounded in facts that would create reasonable doubt concerning the judge's impartiality, *not* in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person *with knowledge of all the circumstances.*'" *State v. Griffen,* 241 Kan. 68, 72, 734 P.2d 1089 (1987) (quoting *State v. Logan,* 236 Kan. 79, 86, 689 P.2d 778 [1984]).

## Discussion

In his brief, Smith highlights two events which he feels illustrate Judge Buchanan's bias. First, Judge Buchanan required the plaintiffs to file a response to Southwest's motion for summary judgment. He argues that the judge was attempting to avoid retrial on the issue remanded by this court. He asserts that the trial judge erred by ignoring the "law of the case" doctrine.

Second, Smith relies heavily upon the events leading to the mistrial, including the judge's reaction to and subsequent disqualification of the plaintiffs' expert witness and the judge's declaration of mistrial without motion from Southwest's counsel. Smith postulates that the judge chose a mistrial because he knew that the jury would find for Smith.

In response, Southwest argues that the affidavits do not support disqualification of the trial judge. It characterizes Smith's complaints as falling into three categories: (1) rulings adverse to the plaintiffs; (2) comments made by the trial judge; and (3) the demeanor of the trial judge. Southwest contends that none of these categories proves bias on the part of the trial judge.

The affidavits submitted to support Smith's claim of bias and prejudice were made by the daughter of one of the victims, Lisa Smith Gilmartin; the expert witness, Neal; and the plaintiffs' counsel, Randall E. Fisher. The Gilmartin and Neal affidavits primarily focus on Judge Buchanan's demeanor at the first trial following remand which resulted in a mistrial. Gilmartin states that "[t]he trial judge's demeanor seemed to change immediately when Mr. Neal came to the stand. His demeanor made . . . clear to me that he did not like the witness." Both Gilmartin and Neal state their opinion that the trial judge intended to prevent Neal from testifying, whether through sustaining Southwest's objections or finally

disqualifying Neal as an expert. Neal states: "In my many years as a consulting expert on motor carrier safety I have never been treated in this manner by any trial judge before whom I have appeared." Similarly, Fisher states: "In nearly twenty years as a trial lawyer, I have never seen a trial judge act in the outrageous manner that Judge Buchanan acted on June 27, 1995." To determine the legal sufficiency of these statements, we will discuss the relevant sections of the trial transcript below.

Adverse evidentiary rulings alone are not ordinarily sufficient grounds for disqualification. In this case, the trial court's request that Smith file a response to summary judgment and its denial of Smith's motion to strike the motion for summary judgment are adverse rulings which do not support the motion to disqualify. We must, therefore, examine whether the facts leading to the mistrial, the declaration of the mistrial, and the disqualification of Smith's expert witness establish bias and prejudice on the part of the trial judge against Smith or his counsel.

The controversy surrounding the granting of the mistrial involves the question of whether Smith's expert, Neal, had changed his opinion on the question of whether Southwest had a duty to audit the driver logs of Printup. The trial court was of the opinion that the witness changed his opinion from the first trial. Counsel for Southwest objected on the basis that the changed testimony violated the pretrial order. Because of the emphasis placed upon this controversy by Smith, the complete record regarding the declaration of the mistrial is set forth below:

Questions by Smith's counsel:

"Q In your opinion, did Southwest Movers have an obligation to formally audit the log books?

"A They should insure themselves—

"Mr. Troutt (counsel for Southwest): No, I object, that's a yes or no. I need to track there. That's a yes or no. I would like to have response.

"Q Answer it yes or no, Mr. Neal. Do they have a duty?

"A Yes.

"THE COURT: Just a minute.

"Q Do—

"THE COURT: Just a minute.

"MR. TROUTT: May we approach?

"THE COURT: Yes, please.

"(The following proceedings were had at the bench off-the-record by Court and counsel after which the following proceedings were had:)

"THE COURT: All right. Restate the question.

"Q Listen to my question, Mr. Neal, what I am saying. Does Southwest Movers, the agency company, have a duty to conduct a formal audit on the log books?

"A Yes. They should audit the log books, yes.

"MR. TROUTT: I will object. This requires out of presence—

"Q Mr. Neal—

"THE COURT: Members of the jury, I am going to ask you to go to the jury room at this time.

"(After the jury had retired to the jury room, the following proceedings continued:)

"MR. TROUTT: We were told when we started this trial in the pretrial order that this witness' opinions would be limited to those he gave in the first trial. You never advised us he was going to change the opinions. We assumed for the defense of this case admissions, which you made at the hearing sometime before trial, there was no duty. Now this witness has obviously changed his opinion, and I am not sure how you handle the situation, or let him go further in his testimony.

"MR FISHER: Well, let me ask. Maybe I didn't put the question the right way.

"THE COURT: No, the question has been asked and answered. It's been asked twice. He can't change his answer.

"MR. FISHER: Let me ask a different question.

"THE COURT: No, we are on the state of the record we are in right now. The Court has indicated an instruction that there's no duty to audit the records and that was a matter that was completely gone through prior to commencement of the trial, again based on this witness' testimony in a prior case.

"MR. FISHER: I understand, but I think what he said in the prior case is something I haven't gotten to yet.

"MR. TROUTT: I disagree.

"THE COURT: Let me see the question in the prior case. Now, let me see the prior testimony.

"MR. FISHER: I don't have it with me, Your Honor. What he said in the prior case was if Red Ball does, they don't; and I think that's what we haven't got to yet.

"THE COURT: Well now, are we going to have testimony that Southwest has a duty to investigate Red Ball to find out if Red Ball is auditing it?

"MR FISHER: No, that's not what I am saying.

"Q Mr. Neal, does—

"THE COURT: No, you are addressing the Court. I am not permitting any questions at this time.

"MR. FISHER: Well, if you give me a chance, I think I can clear it up.

"THE COURT: No. We will excuse Mr. Neal and you can clear it up with me, but I don't want any coaching of Mr. Neal.

"MR. FISHER: I am not coaching him. I am asking him a question if he answers the—

"MR. TROUTT: I would like Mr. Neal to be excused from this hearing.

"THE COURT: Yes. Mr. Neal, would you leave the courtroom, please.

"(Witness leaves the courtroom.)

"THE COURT: How do you think you can clear it up?

"MR. FISHER: What I understand from what he has told me consistently, Your Honor, is that if Red Ball conducts a formal audit, then Southwest doesn't have an obligation to do it. And I think that's what I need to ask. What he said is—

"THE COURT: Where is it going to go from there then?

"MR. FISHER: Where is he going to go from there, while there is not a duty for Southwest to conduct a formal audit because Red Ball did that in this case, that they still have a duty to pay attention to see whether or not the drivers are turning in false logs.

"THE COURT: What do you want to do, Mr. Troutt?

"MR TROUTT: There is a case, and we are going to get it, that it's been cited to me by Mr. Fisher in a similar situation. That's the *Stormont Vail* case. Now, we have different testimony that I am not prepared for based on whatever the damage has been done, and I can't react to it. This witness has to be excused and we have no more testimony from him. The jury should be told that his testimony should not be considered in this case because unfair prejudice to me from this testimony from the stand to clear it up. You can't take what he said, which replaces everything else I said. This has gotten in a posture that can't be cured, so that the witness' testimony can be considered by the jury.

"MR. FISHER: I think it can. If he explains to the jury what I just told you and what he told me, that Southwest does the audit, or if Red Ball does the audit, that Southwest doesn't need to, then the jury will understand what he is talking about and we can move on.

"THE COURT: He already said they have the duty to audit.

"MR. FISHER: But we haven't explained under what circumstances, and what he told me was when we were preparing was that Southwest has the duty if Red Ball doesn't audit, but if Red Ball audits, then Southwest doesn't have the duty to conduct a formal audit.

"THE COURT: Well, let me look at this case.

"MR. TROUTT: Can we take about three minutes?

"THE COURT: I don't know what's back there.

"(Whereupon a recess was taken, after which the following proceedings are had before the Court outside the hearing of the jury.)

"THE COURT: What do you want me to do, Mr. Troutt?

"MR. TROUTT: Well, at this point I don't want the Court to have the idea that's all the law. That's just something.

"THE COURT: I understand.

"MR TROUTT: At this point I would like the Court to not allow Mr. Neal to further testify because I am not in a position to cross-examine to those damages. He has done damage that cannot be cured. I ask the Court to instruct the jury that his opinions cannot be considered at all in this case.

"MR. FISHER: Your Honor, first of all, I think that the motion to strike the testimony is premature. If I am allowed an opportunity to ask him under what circumstances they have a duty, and what circumstances they don't, I am sure he will tell you if Red Ball conducts the audit, that Southwest doesn't need to. That the only time they need to is if Red Ball is not auditing, but that really the essence of his testimony is what Southwest needs to do is have some kind of observation of whether or not the drivers are falsifying their log books.

"Secondly, the *Hagedorn* case doesn't even factually apply. It has to do with an expert who went out and surreptitiously examined the defendant's facility. The remedy is to cross-examine the witness about his prior inconsistent statement. *Hagedorn* has nothing to do with prior inconsistent statement, it has to do with review that was against a Court order. The first thing to do, so the jury understands, he is not talking about a blanket duty. They will understand what is going on.

"MR. TROUTT: I have one other thing to say. Let's solve it by asking these other questions will not solve it. He has also given opinions in his deposition or trial testimony before that Southwest doesn't have an obligation to even keep these

logs, or to keep these documents and crosscheck, so this is not going to be solved. As he testified before, they didn't have to keep the logs.

"THE COURT: Are you moving for mistrial, Mr. Troutt?

"MR. TROUTT: I will consider that after we have the Court's ruling on the first motion. I prefer to proceed as we are proceeding without this witness' testimony.

"MR. FISHER: Well, Your Honor, I don't think that even striking his entire testimony is even appropriate because the other opinions don't have anything to do with the statement like he said, I think this can all be cured.

"THE COURT: No, I don't think it can be cured, Mr. Fisher, because the matter as presented to me that there's absolutely no duty—he claimed there is no duty to audit.

"MR. FISHER: What he said in the previous trial.

"THE COURT. This previous testimony and this was his testimony in the previous trial. He has testified now twice that they do.

"MR. FISHER: What he said, they had no duty because American Red Ball did the audits. We haven't got beyond that yet.

"THE COURT. I am not going to allow him to change his testimony.

"MR. FISHER: It is not changing his testimony. It is explaining his answer. What he said in the previous trial was American Red Ball wasn't doing the auditing as well as it should.

"THE COURT: Do you want to move for mistrial, Mr. Troutt?

"MR. TROUTT: Well, if my first motion is not sustained, then, we will move for mistrial. There's been extreme costs associated with getting this far and that's why I am reluctant to do that if it can be solved.

"THE COURT: Well, the witness has testified for, I haven't kept exact track of time, from 10:35 to 11:10 or 11:15, and that's too much to ask the jury to strike the testimony. I will declare the mistrial.

"MR. TROUTT: Then we will take that remedy.

"THE COURT: Further stating on the record Mr. Neal is disqualified as an expert.

"MR. FISHER: Well, before the witness is allowed to go, Your Honor, I would like to make a proffer of his testimony and have him tell you what his explanation is if he had been allowed to explain the answer to me, so we have a proper record for appeal.

"THE COURT: This mistrial has been declared.

"MR. FISHER: Well, but you also go further and said he is disqualified from testifying.

"MR. TROUTT: He can consider the proffer what he said in his prior testimony.

"THE COURT: The way he tries to qualify him again is immaterial. I will go back and tell the jury what has happened.

"MR. TROUTT: So we are excused, Your Honor?

"THE COURT: Yes."

Counsel for Smith clarified his position for the trial court when he stated that the expert witness would say that Southwest had a duty only if Red Ball did not conduct an audit. He did not ask for time to bring forth the transcript of the previous trial. The trial court expressed genuine concern based upon the contentions of defense counsel that the witness changed his opinion in violation of the pretrial order. Defense counsel said that the damage done to its case was irreparable and that he was not prepared to cross-examine the witness on his new opinion; however, because of the great expense involved, he requested that the testimony of the witness be struck and the jury advised not to consider such evidence. Counsel for Smith asked for time with the witness to clarify the duty involved. The court responded that the witness had twice testified that Southwest had a duty to audit. The record supports this observation.

The above record does not support a finding of judicial bias or prejudice against Smith or Smith's counsel. Rather, it demonstrates the struggle the trial court experienced according to its understanding that an expert witness testifying on behalf of Smith changed his previous testimony by stating that Southwest has a duty to audit driver logs. The issue in this jury trial was whether Southwest authorized or ratified the acts of its driver, Printup. The duty to audit drivers' logs was a pivotal question. The trial judge considered that the damage to the defendant's case was irreparable, a conclusion supported by the comments of defense counsel. Thus, the court declared a mistrial. The record provides no basis for concluding bias or prejudice on the part of the trial court.

Ultimately, the court withdrew its prohibition against Neal testifying. In fact, Neal testified at the retrial. By resolving its dilemma between striking the evidence of the expert or declaring a mistrial, the court preserved fairness by granting a trial before a new jury.

Such action also removes any claim that Smith was denied a fair trial. We agree with the decision of the administrative judge that on these points the affidavits are not legally sufficient to support the disqualification.

The additional grounds for disqualification contained in counsel's affidavit have been considered by this court and the record supports the conclusion reached by the district administrative judge that they fail to demonstrate personal bias, prejudice, or interest of the judge under the provisions of K.S.A. 20-311d(c)(5).

Based upon our decision, we do not consider the cross-appeal.

Affirmed.