No. 77,912

BRUCE R. HAWKINSON, d/b/a COMMUNICATIONS WORLD OF
KANSAS CITY/LAWRENCE/TOPEKA, *Appellee*, v. ROBERT E.
BENNETT AND LINDA K. BENNETT, *Appellants*.

(962 P.2d 445)

566

Opinion filed July 10, 1998.

*Stephen J. Dennis*, of Dennis, Stanton & Redlingshafer, L.L.C., of Kansas City, Missouri, argued the cause and was on the briefs for appellant Robert E. Bennett.

*Gordon M. Rock, Jr.*, of Olathe, argued the cause and was on the briefs for appellant Linda K. Bennett.

*Gordon E. Wells, Jr.*, of Lathrop & Gage, L.C., of Overland Park, argued the cause, and *Marc K. Erickson*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by Robert Bennett and Linda Bennett, husband and wife, from judgments entered against them and in favor of Bruce Hawkinson for a breach of a third-party beneficiary claim concerning the *Master* Franchise Agreement, as well as claims for tortious interference with Hawkinson's *Sales* Franchise Agreement, tortious interference with his prospective business relationships, breach of fiduciary duty, and punitive damages. There are at least 14 issues alleging, among others, claims of erroneous jury instructions, juror misconduct, sufficiency of evidence, and other evidentiary issues.

Communications World International, Inc., (CWI) is a Denver-based telephone interconnect company. Robert and Linda entered into sales franchise agreements with CWI in 1982 and a second sales franchise agreement in 1983. On March 1, 1986, CWI and Robert and Linda entered into an additional agreement called a "Master Franchise Agreement" (Agreement). The first page of this Agreement referred to CWI as "the Franchisor" and Robert Bennett as "the Master Franchisee." Both Robert and Linda signed this Agreement, however, as "the parties hereto," under the lines provided for the signatures for "Master Franchisee." Both Robert and Linda consistently signed correspondence for the Master Franchisee, as exemplified by a letter dated November 4, 1991, to David Hunt, Chairman of CWI. This letter, written by Robert, referred to himself and Linda acquiring the Master Franchise for Kansas City. Robert wrote another letter to Hunt, stating that "Linda and I have met the requirements for productivity, commitment in time,

and ethical behavior in the operation of our franchises and Master Franchise."

In addition to operating as the Master Franchisee, Robert and Linda were also sales franchisees of CWI. Linda operated Communications World of Kansas City, Southwest, Inc. (Southwest), and Robert operated Communications World of Kansas City, West, Inc. (West). Two additional franchises were added in the Kansas City area after Robert and Linda began operating Southwest and West. Stormy Bennett, Robert's brother, operated Communications World of Kansas City, North, and Dennis McKee, a friend of Robert's, operated Communications World of Kansas City, Southeast.

Article 9(c) of the Master Franchise Agreement established between CWI and Robert and Linda provides:

"Master Franchisee shall be the exclusive selling party in the areas assigned to it. The Master Franchisee shall have the right to establish Sales Franchisees in the area assigned to it. . . . All payments and royalties will be made to the Master Franchisee and in turn the Master Franchisee will be responsible for making payments and royalties to the Franchisor. The franchise fee payable by the Sales Franchisee will be paid to the Master Franchisee and no royalties are due on receipt of that amount."

Section (9)(c) also states:

"The Master Franchisee is encouraged to recruit salespeople who can develop to become Sales Franchisees, but the activities of the salespeople must not detract from the results of the Sales Franchisees nor hinder the Sales Franchisees from generating sales for their own account. The Master Franchisee will be responsible for insuring that conflicts do not arise between expansion and the rights of the Sales Franchisees."

Article 7 of the Master Franchise Agreement also provides language pertinent to this case:

"Obligation of the Master Franchisee. The Master Franchisee agrees as follows:
a. The Master Franchisee agrees to supply customer training when necessary.
b. The Master Franchisee agrees to supervise the customer list and to assure good referrals.
c. The Master Franchisee agrees to maintain suitable office space for the Business Telephone Center (B.T.C.). The B.T.C. will provide administrative and marketing support for the Master Franchisee and for those Franchises that are established in the Master Franchise area. The function and workings of the B.T.C. are

as laid out in the Franchisor's Policies and Procedures Manual, a copy of which the Master Franchisee receives at the signing of this agreement."

On June 1, 1988, Hawkinson and CWI entered into a Sales Franchise Agreement. Hawkinson paid $10,000 as an initial franchise fee. Article 5 of the Sales Franchise Agreement provides that "[i]n the event a Master Franchise is established incorporating the Franchisee's sales area, the Franchisee will order equipment through, and remit payments and reports to the Master Franchise but all of the Franchisees rights pursuant to this Agreement will continue to be upheld by the Franchisor." Article 7(c) of the Sales Franchise Agreement delineates that "[t]he Franchisee agrees to maintain a gross sales figure of Twenty Thousand Dollars ($20,000.00) per month, after the initial ninety (90) days of operation of the franchise." Article 7(f) and 7(g) further describe the relationship between Hawkinson, as sales franchisee, and Robert and Linda as Master Franchisees:

"f. The Franchisee will provide to the Franchisor a monthly accounting of all business transacted and will pay to Franchisor the royalty fee applicable to the previous month's cash receipts. The copies of the detailed accounting sheets and records accompanied by the royalty fee shall be received by the Franchisor by the 10th of the month following the month the receipts are collected. If a Master Franchise is established for the area in which the Franchise operates, the Franchisee will be responsible for supplying the Master Franchise the detailed account records and paying the Master Franchisee the royalty fee. . . .

"The Franchisee shall be responsible for paying for all equipment it purchases (orders) either to the Franchisor (or Master Franchisee if one is established). . . .

"g. The Franchisee will sell only products from suppliers or manufacturers approved by Franchisor. All products must be ordered and all installation work or service calls must be made through the Franchisor or the Master Franchisee, if one is established for the Franchisee's sales area."

On October 8, 1992, counsel for CWI wrote Hawkinson a letter which is critical to many issues of this appeal. The October 8 letter states in pertinent part:

"It has become apparent that there is a current impasse reached by all parties in attempting to resolve recurring problems encountered in the existing franchise relationships. This impasse makes it impossible for CWI to offer the opportunity to participate in the new franchise program in the Kansas City area at this time."

In the October 8 letter, CWI also informed Hawkinson that he was in default of his Agreement and

"[i]n accordance with Article 12 of the Agreement, CWI is entitled to terminate the Agreement twenty (20) days from your date of receipt of this letter. However, CWI will delay enforcing its contractual right to terminate the Agreement and will instead use the next thirty (30) day period, as stated above, to seek an alternative resolution to this matter."

Hawkinson ultimately brought suit against CWI when CWI would not offer him the opportunity to participate in a new franchise program offered to other Kansas City sales franchisees. CWI submitted the following policy in an annual report required under the Securities Exchange Act of 1934, and the arbitrator referred to the new franchise program during the arbitration proceedings:

"In August 1992, the company (CW) instituted a new Franchise program and Franchise Agreement. The company is offering the new Franchise program to all potential or future Franchisees and is offering **each eligible existing Franchisee** the opportunity to elect, without charge, to participate in the new program. Approximately 97% of the eligible Franchises under the Pre-1992 Franchise program have converted to the current program."

On February 18, 1994, the Johnson County District Court entered a journal entry confirming Hawkinson's arbitration award entered by the American Arbitration Association on November 10, 1993, against defendant CWI. Robert and Linda testified during this arbitration proceeding against CWI, but they were not named as parties to that proceeding.

On January 14, 1993, Hawkinson filed a petition in Johnson County District Court against CWI, Robert, Linda, Southwest, and West for damages and injunctive relief. The court granted Hawkinson's restraining order enjoining certain activities of CWI, Robert, Linda, Southwest, West, and any individual acting on their behalf. On May 31, 1994, the court granted Hawkinson leave to amend his petition to add a claim for punitive damages for breach of fiduciary duty (Count 6) and tortious interference (Count 7) as to defendants Robert and Linda.

In Hawkinson's suit against CWI *et al.*, the court granted defendants' motion as to all claims against the corporate defendants West and Southwest. At the close of defendants' case, the trial judge

noted that CWI "is no longer a party to this litigation. And I have made the determination that the evidence did not justify claims against Southwest and West and I dismissed those parties."

This left only Robert and Linda as defendants in the litigation. The trial court submitted Hawkinson's claims of tortious interference to the jury but included only three of the nine prospective business relationships. Thus, an instruction was submitted regarding whether the defendants tortiously interfered with Gilbert-McGill, Unimark, and Meadowbrook. The court ruled that there was insufficient evidence to go to the jury regarding tortious interference with Cub Foods, Pay-Rec Schools, Cintas, Garage Door, Hermes, and Ball's Food. The court, however, submitted all nine business relationships, or prospective business relationships, in the instruction relating to Robert and Linda's fiduciary duty to Hawkinson. Robert and Linda provide an inordinate amount of detail about each of their individual dealings or lack of contact with each separate business entity. They try to show that they did not interfere with at least one of the business relationships for which Hawkinson was awarded damages.

After an 8-day trial, the jury returned a verdict in Hawkinson's favor and against Robert and Linda on all claims submitted. The jury found contractual obligations were owed to Hawkinson as a third-party beneficiary of Robert and Linda's Master Franchise Agreement and awarded him damages in the amount of $66,500.00. The jury also found that Robert and Linda had both breached a fiduciary duty owed to Hawkinson, tortiously interfered with Hawkinson's existing contract with CWI, and interfered with his prospective business relationships. The jury awarded Hawkinson $20,500 in damages for these three findings, attributing $10,250 to Linda and $10,250 to Robert. The jury's verdict included a finding that both Robert and Linda were individually liable for punitive damages.

On January 29, 1996, the matter then proceeded for a determination of the amount of punitive damages to be awarded. The trial court first ruled that "[t]he award of punitive damages in favor of the plaintiff is to be against each defendant separately, not against both jointly and [severally]."

K.S.A. 60-3702 (b)(1) through (b)(7) provide the statutory elements used to determine the amount of punitive damages to be awarded. Under the fifth element of attitude and conduct of the defendants upon discovery of the misconduct, the judge found that

"the defendants Bennett were in fact in a superior position to the plaintiff Hawkinson and that the defendants Bennett intentionally manipulated the rules and their relationship with the franchisor CWI to accomplish their end of attempting to get rid of plaintiff Hawkinson. This is the type of attitude which the Court believes the legislature had in mind as being relevant to the assessment of punitive damages."

Ultimately, the trial court assessed punitive damages in the amount of $20,000, in favor of the plaintiff and against Robert, and punitive damages in the amount of $10,000 against Linda.

Robert and Linda timely appealed to the Court of Appeals. The case was transferred to this court pursuant to K.S.A. 20-3018(c).

## I. ARBITRATION EXPENSES

Hawkinson's petition for damages and injunctive relief requested attorney fees and costs. In his affidavit, Hawkinson stated that in order to prevent termination of his sales franchise and to preserve his investment in his sales franchise, he was "forced to incur significant expenses since the date of a purported notice of default from Communications World International, Inc. dated October 8, 1992." He also maintained that since CWI's notice of his default, "I have incurred legal fees in excess of $94,000 in connection with arbitration and related proceedings and have incurred expenses for depositions, travel, arbitration fees, and other matters in an amount in excess of $18,000 in connection with my efforts to preserve my franchise."

Robert and Linda assert the trial court erred in submitting a $33,137.95 claim against them for Hawkinson's attorney fees, expenses, and lost time incurred in arbitration against CWI, because such damages are not recoverable as a matter of law. Linda contends that under the well-established general rule, attorney fees are not allowable as damages in the absence of a statute authorizing their recovery. She cites to *Lines v. City of Topeka*, 223 Kan. 772, 577 P.2d 42 (1978), as authority for this statement.

In *Lines*, this court affirmed the trial court's grant of summary judgment for plaintiff who had been terminated as a building inspector for the City of Topeka. The *Lines* court held that under the doctrine of equitable estoppel, the City was estopped from dismissing plaintiff from his position because the commissioners led plaintiff to believe that he would not lose his job due to a question of whether he was actually a Topeka resident, until the city attorney's office drafted an ordinance defining "residence." 223 Kan. at 774. Plaintiff contended that he should have been granted attorney fees as costs in the action he was forced to bring for his reinstatement.

The *Lines* court ruled that "[g]enerally, attorney's fees are not allowable as damages in the absence of a statute. (*Will v. City of Herington*, 205 Kan. 422, 424, 469 P.2d 256 [1970]; *Barten v. Turkey Creek Watershed Joint District No. 32*, 200 Kan. 489, 510, 438 P.2d 732 [1968)]; *Ablah v. Eyman*, 188 Kan. 665, 682, 365 P.2d 181 [1961].)" 223 Kan. at 782. She neglected, however, to include the next sentence of the paragraph she cited in support of the "well-established general rule," wherein the *Lines* court explained:

"Exercising its equity jurisdiction this court has on occasion taken exception to this rule. In *Barten*, this court approved an allowance of attorney's fees on the theory the District had acted in 'bad faith.' Plaintiff urges us to award fees here on the same theory. We have examined the record and conclude the case before us does not compare with *Barten*. The mere fact a party loses a lawsuit does not justify imposing attorney's fees upon him as costs. Likewise, there is no showing the city was totally unreasonable in its acts under all the circumstances. The district court was correct in denying attorney's fees." 223 Kan. at 782.

*Barten v. Turkey Creek Watershed Joint District No. 32*, 200 Kan. 489, 491, 438 P.2d 732 (1968), involved the question of whether a General Plan of financing, adopted by the board of directors of the Watershed District (the District), was lawful and whether it was proper for the trial court to allow attorney fees to the plaintiffs' attorneys. Plaintiffs included landowners in the District and the county attorney of Dickinson County. The appropriate percentage of District landowners filed a petition with the secretary of the board of directors of the District, in accordance with K.S.A. 24-1215. It thereby became the duty of the board to submit the

question of adoption of the General Plan to the qualified voters of the District. The District, however, refused to call the election, and plaintiffs claimed this refusal forced them to bring a proceeding to enforce the District's compliance with the law. Therefore, plaintiffs requested judgment against the District and reasonable attorney fees for the prosecution of this action. The *Barten* court held:

"It is a general rule that attorneys' fees and expenses of litigation, other than court costs, are not recoverable as an item of compensatory damage, in the same or subsequent action, and are not chargeable as costs against the defeated party, in the absence of a clear and specific statute authorizing such recovery. (*Ablah v. Eyman*, 188 Kan. 665, 682, 365 P.2d 181, 90 A.L.R. 2d 766.)

"The provisions of 60-802 (*c*), *supra*, are substantially the same as G. S. 1949, 60-1710 in the old code of civil procedure, and its predecessor, L. 1909, ch. 182, § 723. Judge Gard, (Gard, Kansas Code of Civil Procedure Annotated, § 60-802c, p. 611) says this subsection is in keeping with the Kansas decisions and the law generally that on judgment for the plaintiff in a mandamus action, he may in the same proceeding recover such damages as he has actually sustained through the wrongdoing of the defendant. The damages recoverable are the injuries sustained as the natural and probable consequences of the wrongful refusal to comply, and the expense reasonably and necessarily incurred in compelling compliance, including reasonable attorneys' fees. [Citations omitted.]" 200 Kan. at 510.

Linda attempts to distinguish *Barten* from the case at hand. She asserts that the *Barten* court applied a historically recognized exception permitting recovery of attorney fees in mandamus proceedings to compel a public official or a public body that in bad faith refused to perform its duty. She insinuates the *Lines* court denied plaintiff's attorney fees because *Lines* was not a mandamus case.

The CWI/Hawkinson sales agreement did not make arbitration optional, such that Hawkinson "elected" to arbitrate instead of proceeding directly to district court. Article 15(h) of the CWI/Hawkinson's Sales Franchise Agreement made arbitration mandatory in the event of controversy.

The following cases recognize the exception to the general rule that attorney fees are not recoverable: *McOsker v. Federal Insurance Co.*, 115 Kan. 626, 224 Pac. 53 (1924) (attorney fees incurred by plaintiffs insurance purchasers in defending actions brought

against them by a third party on notes for insurance premium were recoverable against the insurance company in a subsequent action); *First National Bank v. Williams*, 62 Kan. 431, 63 Pac. 744 (1901) (bank which had brought an action against writer of a bad check was entitled to recover attorney fees the bank expended in a previous suit with a third party regarding the enforceability of the bad check); see *Wilshire Oil Company of Texas v. Riffe*, 409 F.2d 1277, 1285 (10th Cir. 1969); *Safway Rental & Sales Co. v. Albina Engine & Machine Works*, 343 F.2d 129, 133 (10th Cir. 1965).

The case of *Duggan v. Rooney*, 749 F. Supp. 234 (D. Kan. 1990), involved an appeal of a summary judgment motion, finding in favor of plaintiff and against Massachusetts Mutual Life Insurance Company. The plaintiff (Duggan) contended that Rooney's failure to be a licensed insurance agent in the state of Kansas, as provided under K.S.A. 40-244, when he solicited the decedent, constituted a breach of legal duty owed to Duggan. Plaintiff asserted that if Rooney had been properly licensed, she would not have been forced to sue on the conditional receipt to recover the insurance proceeds. The *Duggan* court stated:

"The general rule regarding recovery of attorneys' fees is that 'in the absence of any contractual or statutory liability therefor, counsel fees and related expenses are not recoverable as an element of damages.' *Wilshire Oil Co. v. Riffe*, 409 F.2d 1277, 1285 (10th Cir. 1969); *Farmers Cas. Co. v. Green*, 390 F.2d 188, 192 (10th Cir. 1968) ('under Kansas law and traditionally, attorneys' fees can be awarded only if provided for by contract or authorized by statute').

"However, an exception to this rule has been recognized in Kansas where the plaintiff has been forced to litigate against a third party because of some tortious conduct of the defendant. The recognized exception is stated as follows:

'If one's property is taken, injured or put in jeopardy by another's neglect of duty imposed by contract, or by his wrongful act, any necessary expense incurred for its recovery, repair or protection is an element of the injury. It is often the legal duty of the injured party to incur such expense to prevent or limit the damages; and if it is judicious and made in good faith, it is recoverable, though abortive.' [Citation omitted.]" 749 F. Supp. at 241.

The arbitration with CWI was a foreseeable, natural, and proximate consequence of Robert and Linda's conduct. Robert and Linda were CWI's largest producers and acted in concert with several other large producers, when they wrongfully withheld roy-

alties for several months demanding that CWI terminate Hawkinson's franchise.

On October 8, 1992, CWI sent Hawkinson a letter, which Hawkinson deems a notice of default and termination letter. The letter excludes him from "the opportunity to participate in the new franchise program in the Kansas City area at this time." Other parts of this October 8 letter are important to this issue, as well as to Robert and Linda's assertion that the Agreement between Hawkinson and CWI was never actually breached. This letter also stated:

"[I]t is apparent that it is not in the best interest of any of the involved parties to attempt to maintain the franchise relationship as reflected by your current Agreement. If that relationship was working and if it was your desire to do so, CWI would continue to honor the Agreement. As you are aware, however, that relationship is not working, nor does it seem to be your desire to continue operating under that Agreement. Records show that you are not fulfilling your obligations under the Agreement in terms of deficiencies in meeting the stated productivity levels and deficiencies in payments owed to the Master Franchisee.

. . . .

"CWI regrets that the proposed resolution to this matter must necessarily involve the suggestion that your franchise be cancelled. However, as you are well aware, CWI has exhausted all other possibilities of resolving the disputes which have continually plagued your relationship with Mr. Bennett, who, as a Communications World franchisee, has been delegated certain responsibilities and has assumed certain rights of CWI under your Agreement. CWI is not in a position where it can arbitrarily prefer the interests of one franchisee over another. CWI's records show that you are in default of your Agreement, as mentioned above, and that Mr. Bennett is not in breach of his Master Franchise Agreement with CWI. In addition, contrary to the claims contained in your various letters to CWI, there has been no breach of the Agreement by CWI, itself, or by and through its Master Franchisee. Rather than revisit CWI's response to your claims of breach, I would refer you to the letter written to you on August 8, 1992, by Tony Hildebrand, Vice President - Franchising of CWI. I believe that letter quite clearly states CWI's position with respect to the ongoing problems which you have encountered and makes it clear that none of your complaints constitute a breach by CWI of the Agreement.

"In contrast, you are in breach of the Agreement by failing to maintain gross sales figures of $20,000 per month (Sections 7.c. and 12.b.); by repeatedly failing to make proper royalty payments to the Master Franchisee (Sections 7.f., 8.a. and 12.a.); and by selling products and equipment obtained from suppliers or manufacturers not approved by CWI and by failing to consistently utilize the Master Franchisee for installation and service work (Sections 7.g. and 5). In accordance with Article 12 of the Agreement, CWI is entitled to terminate the Agreement

twenty (20) days from your date of receipt of this letter. However, CWI.will delay enforcing its contractual right to terminate the Agreement and will instead use the next thirty (30) day period, as stated above, to seek an alternative resolution to this matter.

"With that being said, CWI is hopeful that all parties can move beyond what has proven to be an insurmountable problem with the existing franchise relationships in the Kansas City area. Failing that, CWI stands ready to abide by and enforce the Agreement which it has executed with you and you will be expected to cure the above-noted deficiencies under your Agreement."

Under the Hawkinson/CWI Sales Franchise Agreement, Hawkinson did not have the option of bypassing arbitration; arbitration was mandatory. Article 15(h) of the Hawkinson/CWI Sales Franchise Agreement provided that "[a]ny controversy which may arise between the parties pursuant to this Agreement *shall* be settled by arbitration in Denver, Colorado in accordance with the rules of the American Arbitration Association." (Emphasis added.) Kansas law, as well as Colorado law, recognizes that a plaintiff can recover attorney fees under such circumstances.

The arbitration proceeding was a result of Robert and Linda's wrongful acts of trying to force CWI to terminate Hawkinson's franchise. Consequently, the trial court did not err in awarding attorney fees on the basis of the third-party beneficiary exception.

## II. SEPARATE CLAIMS

Robert and Linda claim they were prejudiced by the jury instructions partially because they claim the trial court should have submitted the claims against Linda and Robert separately.

### A. Standard of review

In *Noel v. Pizza Management, Inc.*, 258 Kan. 3, 12, 899 P.2d 1013 (1995), the court stated the well-established rules governing the standard of appellate review of alleged errors in jury instructions:

"'It is the duty of the trial court to properly instruct the jury upon a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct, and

the jury could not reasonably be misled by them, the instructions will be approved on appeal.' *Cerretti v. Flint Hills Rural Electric Co-op Ass'n,* 251 Kan. 347, 353, 837 P.2d 330 (1992)."

Also, " 'jury instructions are to be considered together and read as a whole, without isolating any one instruction.' " *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 490, 856 P.2d 906 (1993) (quoting *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 355, 837 P.2d 330 [1992]). Further, "[i]f the jury instructions, read as a whole, fairly instruct the jury on the law governing the case, are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal." *In re Application of the City of Great Bend for Appointment of Appraisers,* 254 Kan. 699, 713, 869 P.2d 587 (1994). Instructions Nos. 11 and 12 are pertinent jury instructions to be taken into consideration in determining whether the instructions fairly instructed the jury on the law overall, and whether the jury could not *reasonably* have been misled by them. Instruction No. 11 stated:

"The plaintiff, Bruce R. Hawkinson, claims he was damaged by the following actions of the defendants: (1) breach of a contract for which he was a third party beneficiary; (2) tortious interference with contract; (3) tortious interference with prospective business relationship; and (4) breach of fiduciary duty.

"The plaintiff has the burden to prove that it is more probably true than not that he sustained damages as a result of any one or more of the above listed actions of the defendants."

Instruction No. 12 stated in part:

"Defendants deny that they have tortiously interfered with the contractual relationship between plaintiff and Communications World International. Defendants further deny that they have tortiously interfered with any existing or prospective business advantage or relationship of plaintiff.

"Defendants contend that all actions they have taken with respect to plaintiff have been justified under all of the circumstances. Defendants have the burden to prove that it is more probably true than not that they were justified.

"Defendants deny that a fiduciary relationship has ever existed between themselves and plaintiff, and further deny that they have breached any fiduciary duty they may have owed to plaintiff.

"Defendants deny the existence, nature and extent of plaintiff's claimed damages."

## B. Tortious interference with Hawkinson's prospective business relationships

The argument here is that Robert and Linda should have had instructions that made it clear that they were separate entities since both of them did not have contact with all the businesses, *i.e.*, Linda claims to have had no contact with seven of the businesses and Robert with three of the businesses. As we view Instruction No. 20, it does not require a finding that Robert or Linda tortiously interfered with each of Hawkinson's prospective business relationships. Its wording allows the jury to determine whether there was tortious interference with a prospective business relationship. Further, before the jury could award damages for tortious interference with a prospective business relationship, it had to find the existence of a business relationship or expectancy with the probability of future economic benefit to Hawkinson. The instruction allowed the jury to find tortious interference with any of the three prospective business relationships. Linda does not deny that she had dealings with Unimark, and Robert does not deny that he had dealings with Gilbert-McGill or Meadowbrook. When the instructions are considered as a whole, the instructions were not erroneous.

## C. Claim for breach of fiduciary duty

Robert and Linda contend that there is no evidence to support Instructions Nos. 22 or 23. Instruction No. 22 stated:

"The plaintiff's fourth claim is that a fiduciary relationship existed between the plaintiff and the defendants Robert and Linda Bennett, as Master Franchisees, and that the defendants breached their fiduciary duty in one or more of the following respects:

1. By failing to properly support, assist and help plaintiff as a Sales Franchisee;
2. Efforts by defendants to obtain the termination of plaintiff's sales franchise;
3. Encouraging CWI to declare Mr. Hawkinson in default;
4. By interfering with the following existing and prospective customers of plaintiff: Gilbert-McGill, Unimark, Meadowbrook, Cub Foods, Ray-Pec Schools, Cintas Corp., Garage Door Co., Hermes and Ball's Foods;
5. By denying plaintiff the right to future business as provided in his contract with CWI;
6. Unilaterally withdrawing and withholding valuable discounts and special terms from plaintiff;

7. Acting contrary to CWI's Sales Franchisee Policy and Procedure Manual and by creating their own 'guidelines'.

"It is for you to determine whether a fiduciary duty existed and if so, whether it was breached as alleged."

## Instruction No. 23 explained:

"The term 'fiduciary relationship' refers to any relationship of blood, business, friendship or association in which one of the parties places special trust and confidence in the other.

"It exists in cases where there has been a special confidence placed in one, who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one placing the confidence.

"A fiduciary has the duty to act in good faith and with due regard to the interests of the party placing confidence in him."

Linda argues that these instructions allowed the jury to consider Hawkinson's claim for breach of fiduciary duty, based in part on the interference with all nine of the alleged customers or prospective customers. Thus, Linda argues that these instructional errors permitted the jury to consider wholly unsubstantiated submissions as to Robert and Linda.

The trial judge allowed all nine of Hawkinson's alleged prospective business relationships to be included in the instruction dealing with whether there was a fiduciary duty between Hawkinson and Robert and Linda, as Master Franchisees. Inclusion of prospective customers with whom either Robert and/or Linda may have had no individual dealings presents different considerations in terms of fiduciary duty than with the tortious interference instructions.

Both Linda and Robert had a fiduciary obligation to Hawkinson. The trial court found as a matter of law that Robert and Linda owed Hawkinson the duties of a fiduciary. Therefore, even if Robert and/or Linda did not deal with a prospective customer, they were liable for one another's acts in terms of their actions as Master Franchisee and in their roles as fiduciaries.

### D. Claim for tortious interference with the Sales Franchise Agreement

Linda also argues that because there was no determination that either she or Robert was responsible for one another's conduct, it was error for the court to submit Instructions Nos. 17 and 18,

which allowed the jury to consider the conduct of one defendant in determining liability for Hawkinson's claim of tortious interference with the Sales Franchise Agreement. Linda tries to refute the fact that the jury answered questions on the verdict form indicating it found both Linda and Robert liable, by arguing that without the improper submissions, the jury would never have considered loss of profits or future profits with the alleged improper prospective customer claims, or mutual responsibility for damages arising from the tortious interference with the Sales Franchise Agreement. Furthermore, she also alleges that these improper submissions allowed the jury to find both Robert and Linda liable for punitive damages.

Hawkinson first asserts that Robert and Linda failed to provide any citation to the record demonstrating that either Robert or Linda timely objected to any of the instructions on the basis that the defendants should be referred to separately as Linda and Robert and not joined as "the defendants." They also never specifically objected to the fact that separate instructions were not generally given as to Robert and Linda. Robert and Linda objected to nearly every instruction given, but the only instance of a specific objection to the instructions' referral to Robert and Linda as "defendants" was an objection that the word "misconduct" in Instruction No. 20 "ought to be divided."

We hold Robert and Linda failed to object to the complained-of jury instructions with sufficient specificity to preserve the objection for appeal, and the jury instructions are not clearly erroneous. K.S.A. 60-251(b) provides:

"No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he or she objects and the grounds of his or her objection unless the instruction is clearly erroneous. Opportunity shall be given to make the objections out of the hearing of the jury."

This court defined a clearly erroneous instruction in *Nail v. Doctor's Bldg., Inc.*, 238 Kan. 65, 67, 708 P.2d 186 (1985): "An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility that the jury would have returned a different verdict."

When the instructions cited by Robert and Linda as erroneous are read in conjunction with the verdict form, it is clear that the jury had to establish that the tort liability of Linda and Robert was separate. Before the jury could enter a verdict against either Robert or Linda for any of the alleged torts, the jury was required to determine that the specific defendant committed the specific tort. Also, the verdict form prevented confusion by requiring the jury to separate and attribute any tort damages between the two individuals. The verdict form stated the following questions, to which the jury answered "yes" to all of the questions or submitted damage amounts where appropriate:

"1. Do you find that the defendants Robert and Linda Bennett, breached contractual obligations owed to the plaintiff as a third party beneficiary?"

"2. If your answer to question one is yes, state what total amount of damages, if any, you find plaintiff [Hawkinson] sustained due to the breach.

$ 66,500"

"3. Do you find that the defendant Robert Bennett breached a fiduciary duty owed to the plaintiff?"

"4. Do you find that the defendant Linda Bennett breached a fiduciary duty owed to the plaintiff?"

"5. Do you find that the defendant Robert Bennett tortiously interfered with plaintiff's existing contract with Communications World International, Inc.?"

"6. Do you find that the defendant Linda Bennett tortiously interfered with plaintiff's existing contract with Communications World International, Inc.?"

"7. Do you find that the defendant Robert Bennett tortiously interfered with plaintiff's prospective business relationships?"

"8. Do you find that the defendant Linda Bennett tortiously interfered with plaintiff's prospective business relationships?"

"9. If you have answered 'Yes' to any one or more of questions three through eight inclusive state what total amount of damages, if any, you find plaintiff sustained as a result.

$20,500"

"10. Of the damages, if any, set out in your answer to question nine, state the amount attributable to the actions of:

Robert Bennett    $10,250
Linda Bennett    $10,250

(The amount attributable to Robert Bennett and the amount attributable to Linda Bennett, when totaled together must be the same as the amount set out in your answer to question nine.)

"The amount of actual damages, if any, set out in your answers to questions two and nine, when totaled together cannot exceed the total amount of plaintiff's claim, as you were instructed in Instruction No. 24."

"11. Do you find that defendant Robert Bennett should be liable for punitive damages?"

"12. Do you find that defendant Linda Bennett should be liable for punitive damages?"

Thus, the verdict form allowed the jury to clearly decide whether Robert or Linda had individually breached a fiduciary duty.

Both Robert and Linda signed the Master Franchise Agreement. Therefore, a valid argument exists that they are jointly liable. In fact the judge gave an instruction stating that "[w]hen two or more persons have joined in obligating themselves by contract, each person is wholly liable." Both Robert and Linda signed the agreements for the franchises, West and Southwest.

The trial court and the jury heard the evidence and analyzed the credibility of the witnesses. After the 8-day trial, the jury found that Robert and Linda were both liable for tortious interference with some of Hawkinson's proposed or actual customers, that they were both liable for breach of fiduciary duty, and that they were both liable for punitive damages.

"If a verdict is attacked on the grounds that it is contrary to the evidence, it is not the function of this court on appeal to weigh the evidence or to pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the successful party, will support the verdict, this court will not intervene." *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, Syl. ¶ 4, 856 P.2d 906 (1993).

The jury instructions, read as a whole, fairly instructed the jury on the law governing the case, were substantially correct, and the jury could not reasonably have been misled by them. We find no error.

### III. POSSIBILITY OF DUPLICATIVE DAMAGES

Robert and Linda are claiming that the verdict form improperly permitted the jury to assess duplicative damage awards for interference with Hawkinson's customers or prospective customers, under both contract and tort theories.

Robert and Linda cite *State ex. rel. Stephan v. GAF Corp.*, 242 Kan. 152, 747 P.2d 1326 (1987), as authority that a plaintiff is only entitled to one recovery for a wrong, regardless of the number of

legal theories he or she is permitted to pursue. In *GAF Corp.*, the State brought an action against GAF, alleging that it had committed breach of express warranty, negligence, and fraud in connection with GAF's actions involving the construction of a roof for a new state building called the Flint Hills Lodge, a building for the Kansas Neurological Institute in Topeka. A GAF specification was used in constructing the new roof and the roof was built by a general contractor approved as a GAF roof installer. After the installation, GAF inspected and approved the roof and issued a written 10-year guarantee. Almost immediately after completion, the roof leaked profusely. GAF refused to accept responsibility for the leaks, and the State had to install a new roof. *GAF Corp.*, 242 Kan. at 153-54.

At trial, the jury was provided with specific instructions on fraud and fraud by silence. The jury found GAF guilty of fraud and awarded actual damages of approximately $70,000, as well as punitive damages in the amount of $1,000,000. One of GAF's complaints on appeal was that the trial court erred in not requiring the State to elect between its contract and tort theories. The *GAF Corp.* court held that an election of claims is required only when the claims are inconsistent; claims are inconsistent where one claim alleges what the other denies. Stated another way, the allegations in one claim must be repugnant to the other. Thus, the *GAF Corp.* court held that "[t]he jury in this case found that GAF breached the terms of its express warranty to the State. It also found that GAF was guilty of negligence. Only one recovery of actual damages was sought or permitted. The trial court did not err in failing to require an election." 242 Kan. at 160. GAF further contended that "the trial court erred in the verdict form submitted since it did not adequately set forth the appropriate basis for recovery upon the alternative theories of negligence and contract." 242 Kan. at 160. The *GAF Corp.* court found this assertion unconvincing and held that

"under the circumstances of this case, the inadequacies of the verdict form were harmless. The case was presented on the theories of breach of express contract, negligence, and fraud. The jury specifically found that GAF breached its written guaranty contract, that it was negligent, and that it was guilty of fraud. The verdict

form permitted only one recovery, and there is no contention by the appellant that the various amounts of actual damages sought were not properly recoverable on the theory of negligence. GAF argues that consequential damages were not recoverable for a breach of its express written warranty, and that the jury should have been specifically instructed and required to find the damages recoverable for breach of express warranty. If the jury had found breach of warranty but no negligence, appellant's complaint would have merit. However, considering all of the findings of the jury, we find no error." 242 Kan. at 160.

Robert and Linda never specifically objected to the verdict form as duplicative. As a result, the clearly erroneous standard applies.

The case at hand is distinguishable from the *GAF Corp.* case. In *GAF Corp.,* all of the alleged wrongs flowed from the one act of installing the roof. This act led to various claims on different theories, and plaintiff was allowed to submit the various theories, but was only allowed to collect damages for one theory. In this case, there was a variety of distinct wrongful acts that Robert and Linda allegedly committed, aside from merely interfering with Hawkinson's existing or prospective customers. Robert and Linda's interference with Hawkinson's existing or prospective customers was only one of many reasons asserted for their breach of contractual obligations owed to Hawkinson as a third-party beneficiary of the Master Franchise Agreement between CWI and Robert and Linda. For example, Hawkinson presented evidence that Robert and Linda wrote numerous letters to CWI urging CWI to terminate Hawkinson's franchise. Also, there was testimony that the Master Franchise was not fulfilling its obligations to help sales franchisees, such as Hawkinson. It is impossible to determine what reason or reasons the jury used to determine that Robert and Linda owed Hawkinson damages because they breached contractual obligations owed to Hawkinson as a third-party beneficiary.

The jury could have used many reasons to reach its conclusions regarding damages on the contract claim, aside from Robert's and Linda's alleged conduct constituting interference with Hawkinson's existing or prospective customers. The jury instructions and the verdict form, when read as a whole, fairly instructed the jury on the law governing this case. Therefore, the trial court did not err in allowing the jury to assess damages on both theories.

## IV. RES JUDICATA OR COLLATERAL ESTOPPEL

The arbitrator specifically found:

"CW has condoned the conduct of its agent, Bennett, in acquiring customers solicited by Hawkinson and is therefore responsible for damages asserted. Direct and cross-examination of witnesses sustain a factual determination that 'lost' accounts include Gilbert/McGill, who Hawkinson determined would be moving to his territory and who advised Bennett that they were already in discussions with Hawkinson; Unimark, a former Executone Franchise customer of Hawkinson which Linda Bennett ultimately acquired; and, Meadowbrook, with CW (through Aletha Zens) suggesting that the profit be split, with customer designation being that of Hawkinson until the President of CW interceded and decided that Bennett should receive the customer. Other 'customers' are too speculative and there is no certainty warranting a finding of fact. The process which Hawkinson has used to project future losses, although thoughtful, cannot be accepted as factual due to the rapidly changing marketplace, lack of customer loyalty, and speculative nature as to level of profits. Other matters involving damages apply not to CW, but rather Bennett directly as to be determined by the Court system in Kansas."

### The findings and awards of the arbitrator also included:

"CW attempted to terminate the relationship between itself and Hawkinson based upon items of default under the Agreement. Hawkinson fully admits and the Arbitrator finds that Hawkinson did not meet a sales quota of $20,000.00 per month, nor did he pay invoices within 15 days on a regular basis, two (2) reasons given by CW for justifying termination of contract. Hawkinson denied the other significant allegation of CW that he failed to devote his principal efforts to his own sales territory. During the course of the Arbitration, counsel for CW and Hawkinson stipulated that Hawkinson was not restricted to his sales area, he could sell outside of his territory; Claimant was to place primary emphasis within his own territory. At issue is whether or not this conduct constitutes a breach of the Agreement between the parties; and, whether CW has waived its right to declare a default based upon historical perspective and a 5 year relationship between CW and Hawkinson.

"Hawkinson had discussions with Aletha Zens, the Director of Franchise Relations of CW, who advised him that no Franchisee had ever been dismissed (contract terminated) for failing to obtain the sales goal of $20,000.00 per month. Ms. Zens did affirm the conversation in her testimony. Tony Hildebrand, Vice President for Franchising at CW had been a part of the franchise system for several years as a Master and had Franchises which did not meet the $20,000.00/month sales goal; none of them had been defaulted. Furthermore, under the new system, the sales goal has been eliminated as well as the concept of exclusive territories. Hildebrand also followed the CW policy of 30 day payment of invoices unlike the Bennetts who instituted their own 15 day limit.

"The Master Franchisee was a 'family affair' in that Robert and Linda Bennett (husband and wife) were involved as the Master Franchisee, both Bennetts initially had their own individual Franchises under the Master; Stormy Bennett (Bob's brother) had another Franchise under the Master; another of Bob's brothers was initially involved with Stormy; and, the key employees of the Master were intertwined—Sharon and Karen are sisters, Cindy is a roommate of Karen, and the Bookkeeper (Pam Meek) is the sister-in-law of Sharon. Over the years, all 'non-family' franchisees, people such as Hawkinson, dropped out of the Kansas City Master Franchise except for Hawkinson. The Bennetts have no desire or intent to add to their Master Franchise any additional Franchisees; and, the Bennetts have a strong desire to remove Hawkinson from the system. CW has been advised of the position of Bennett and requested to remove him, even though the contract is only between Franchisor and the Franchisee. CW took no action as against Hawkinson (who almost never reached the $20,000.00/month goal) until Bennett requested his removal for default. Bennett affirmed in his testimony that he was one of the largest sales producers, owner of 45,000 shares of stock in CW, and that 'CommWorld is family.'

" . . . Mr. Hildebrand confirmed that he was not aware of any other Franchisee who had been terminated for default since new management had been inserted into positions at CW in late 1991/early 1992. In CW's response to Plaintiff's First Interrogatories (Exhibit C-49) Question #3 requires identification of Sales Franchisees who have been terminated by CW solely for failure to maintain gross sales of $20,000.00 per month. The response was that no Franchisee has ever been terminated solely for this reason. Current CW President, Richard Olson testified that to his knowledge Hawkinson is the only Franchisee declared in default, and that 95% of the former Franchisees are now under the new Agreement where the $20,000.00 per month goal is no longer required. CW requires invoices be paid within 30 days; the 15 day rule is that procedure implemented by Bennett. Hawkinson did not make payments consistently within 15 days, but all of his payments were made within 30 days.

"The Arbitrator does find that CW had consistently waived any requirement of a $20,000.00 goal; and, that the 15 day invoice concept was not a significant issue for CW. Furthermore, Hawkinson did in fact expend his principal efforts toward the geographic territory assigned to him, although he did have a greater measure of success in geographical locations outside of his assigned territory. The Bennetts and Hawkinson are engaged in a significant pattern of harassment, one as against the other, through conduct of Bennetts and through an explosion of paperwork by Hawkinson."

## Therefore, the arbitrator made an award

"in favor of Claimant, Bruce R. Hawkinson, as against Respondent, Communications World International, Inc. in an amount of $35,635.67. Furthermore, Hawkinson is determined to be an 'eligible existing Franchisee' and may elect, without charge, to take advantage of the opportunity to participate in the new

franchise program. Should Hawkinson choose this option, CW shall accept him into the new program. This Award is in full settlement of all claims submitted to this Arbitration."

Robert and Linda claim that the trial court erred in admitting evidence, over their objection, and in submitting Hawkinson's damage claims based on interference with his customers or proposed business relationships because such claims are precluded by the doctrine of res judicata or the rule of collateral estoppel. Robert and Linda assert that they are the subject of Hawkinson's prior arbitration award against CWI and cite the section of the arbitration proceeding wherein the arbitrator found that CWI "had condoned the conduct of its agent, Bennett, in acquiring customers solicited by Hawkinson and is therefore responsible for damages asserted." Thus, they argue that the arbitrator's finding of liability on the issue of customer interference was based on agency principles, and not CWI's independent conduct.

Robert and Linda cite *Jackson Trak Group, Inc. v. Mid States Port Authority*, 242 Kan. 683, 751 P.2d 122 (1988), as authority that the doctrine of claim preclusion, or res judicata, prevents parties from relitigating a cause of action that has been finally adjudicated. In *Jackson Trak Group, Inc.*, Mid States Port Authority (Mid States) was an operator of a short line railroad in Northwest Kansas. Jackson Trak Group, Inc., (Jackson Trak) constructed and rehabilitated railroad track. Mid States and Jackson Trak entered into three separate contracts to rehabilitate portions of Mid States' lines. All three contracts bound the parties to mandatory arbitration. After notifying Jackson Trak that its work was defective, Mid States filed an action in the Phillips County District Court for possession of Jackson Trak's equipment. Prior to receiving judicial approval, Mid States seized Jackson Trak's equipment. Jackson Trak subsequently filed an application for mandatory injunction and replevin of property but specifically reserved the right to determine the issue of defective work in an arbitration proceeding. The Phillips County District Court ruled that Mid States had seized Jackson Trak's equipment following the contractual procedure but refused to determine issues subject to arbitration under the contracts. *Jackson Trak Group, Inc.*, 242 Kan. at 683-86.

Jackson Trak then initiated arbitration proceedings, and Mid States objected to the arbitrators' power to award damages for "conversion" of Jackson Trak's equipment because that issue had already been decided by the Phillips County District Court. The arbitrators found for Jackson Trak on all issues and awarded damages. The Sedgwick County District Court affirmed the arbitration award and Mid States appealed the confirmation order asserting various issues, including a claim that the district court had no jurisdiction to award damages for Mid State's seizure of Jackson Trak's equipment because that issue had already been decided by the Phillips County District Court. *Jackson Trak Group, Inc.*, 242 Kan. at 687-88.

The *Jackson Trak Group, Inc.* court held that res judicata did not apply to bar the district court's affirmation of the arbitration award and went on to discuss the elements of res judicata. The court first noted that the doctrine of res judicata has two aspects: claim preclusion and issue preclusion and stated that under the claim preclusion aspect of res judicata:

"An issue is res judicata when four conditions concur: (1) identity in the things sued for, (2) identity of the cause of action, (3) identity of persons and parties to the action, and (4) identity in the quality of the persons for or against whom the claim is made. [Citation omitted.]" 242 Kan. at 690.

The *Jackson Trak Group, Inc.* court also stated:

"Under Kansas law, collateral estoppel may be invoked where the following is shown: (1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment, (2) the parties must be the same or in privity, and (3) the issue litigated must have been determined and necessary to support the judgment. [Citation omitted.]" 242 Kan. at 690-91.

In order to invoke the doctrine of res judicata or collateral estoppel, all of the elements must be met. Robert and Linda fail the first element of res judicata because Hawkinson was suing to prevent CWI from terminating his franchise. Even if Robert and Linda were deemed parties to the action, they were not involved in the CWI/Hawkinson arbitration to prevent CWI from terminating Hawkinson's franchise. Thus, they did not have identity of the cause of action. In fact, the arbitrator, and the jury in this case,

found the opposite proposition was true: Robert and Linda were attempting to force CWI to terminate Hawkinson's franchise.

The arbitrator found that CWI's declaration of Hawkinson's "default" was not proper because CWI has waived "its right to have asserted a default. CW is estopped from taking this position due to its historical record and interaction with Hawkinson. CW's conduct and response under the existing Franchise Agreement is not in good faith or fair dealing; and the default asserted is nothing more than a ruse to keep Hawkinson ineligible." Given this statement, Robert and Linda's interference with Gilbert-McGill, Unimark, and Meadowbrook, was not necessary to support the judgment against CWI.

In conclusion, Robert and Linda's claim does not meet the elements of res judicata or collateral estoppel. Furthermore, in their motion in limine, they denied any connection with the arbitration proceeding, except in their roles as witnesses. Therefore, they fall within the rule succinctly stated in *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, Syl. ¶ 3, 856 P.2d 906 (1993), that "[o]n appellate review, a party may not complain of rulings or matters to which it has consented or take advantage of error that it invited or in which it participated."

## V. LOSS OF PAST AND FUTURE PROFITS

### A. Hawkinson's testimony regarding future profits

Robert and Linda argue that the trial court abused its discretion by allowing Hawkinson to testify, over their objection, as to his unsupported opinions and conclusions concerning past and future profits. Robert and Linda cite K.S.A. 60-456(a), which provides:

"If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony."

K.S.A. 60-419 sets out the standard regarding the competency of a witness to testify:

"As a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof, or experience, training or education if such be required. Such evidence may be

by the testimony of the witness himself or herself. The judge may reject the testimony of a witness that the witness perceived a matter if the judge finds that no trier of fact could reasonably believe that the witness did perceive the matter."

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. [Citation omitted.]" *Smith v. Printup*, 262 Kan. 587, 592, 938 P.2d 1261 (1997). See also *City of Dodge City v. Hadley*, 262 Kan. 234, 239, 936 P.2d 1347 (1997) (admission of expert testimony); *McKissick v. Frye*, 255 Kan. 566, 577, 876 P.2d 1371 (1994) (admission of evidence); *Hurlbut v. Conoco, Inc.*, 253 Kan. 515, 529, 856 P.2d 1313 (1993) (discovery and admission of evidence).

Hawkinson testified at trial as to how he had calculated his damage from the loss of the Gilbert-McGill account. Robert and Linda objected that Hawkinson was testifying without proper foundation and "offering opinions concerning lost profits based upon data which is not in evidence. The data used by an expert under Kansas law must be in evidence." They further objected that "before a witness offers opinion testimony concerning lost profits the underlying data must be made known to him. Under the statute 'made known to him' means in evidence." Counsel for Hawkinson responded:

"Your Honor, that goes to expert opinion. The rule—first of all, the summary has been admitted, that summary of his calculations. The documents which underlie them would be admissible. They do not have to be admitted. He can testify that he reviewed those documents under the calculations he made, and the opinion he's giving as to what the profit would have been to him."

The trial judge ruled that Hawkinson was not testifying as an expert and allowed him to continue testifying as to his opinion. Hawkinson maintains that he clearly had personal knowledge of the financial and sales history of his franchise. Hawkinson entered into the Sales Franchise Agreement with CWI on June 1, 1988. Therefore, he had approximately 5 years of experience regarding the sale of telecommunications equipment prior to the arbitration proceeding in 1993. Further, he had at least 17 years of similar experience before entering the Agreement with CWI.

In *Hampton v. State Highway Commission*, 209 Kan. 565, Syl. ¶ 10, 498 P.2d 236 (1972), the court stated that "[w]hether a witness, expert or layman, is qualified to testify as to his opinion is to be determined by the trial court in the exercise of its discretion. That discretion is not subject to review except for abuse." Discretion is abused only where no reasonable person would take the view adopted by the trial court. Hawkinson had sufficient experience to give his opinion regarding loss of profits and loss of future profits, and how he calculated the loss. The jury was free to give whatever weight, if any, it deemed appropriate to Hawkinson's testimony. The trial court did not err in allowing Hawkinson to testify.

### B. Submitting Hawkinson's claims for loss of profits and loss of future profits

Robert and Linda also contend that the trial court abused its discretion in submitting Hawkinson's claims for loss of profits and loss of future profits because the evidence of such loss of profits and loss of future profits was too contingent, remote, and speculative. In *Cott v. Peppermint Twist Mgt.Co. Inc.*, 253 Kan. 452, Syl. ¶ 8, the court stated that "[i]n reviewing an award for an objective element of damages such as loss of past and future income, an appellate court must look to the record to see if there is evidence to support the jury's calculation of pecuniary loss." The trial court submitted Instruction No. 24, which states:

"If you find for the plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate the plaintiff for the damages you believe plaintiff sustained as a result of the actions complained of by plaintiff.

"The total amount of your verdict may not exceed $271,430.45."

Robert and Linda operated their sales franchises and the Master Franchise as one entity. Further, both Robert and Linda signed each of the Sales Franchise Agreements and they both signed the Master Franchise Agreement. Consequently, their actions were attributable to one another. An explanation of how they operated their businesses as one entity is provided under Issue IX.

The jury awarded Hawkinson damages of $10,250 against Robert for his interference and $10,250 against Linda for her interference.

Upon review of the record, we hold that there was evidence to support the jury's calculation of damages.

The trial court submitted Gilbert-McGill, Unimark, Meadowbrook, Cub Foods, Ray-Pec Schools, Cintas Corp., Garage Door Co., Hermes, and Ball's Foods in the instruction on whether Robert and Linda had breached their fiduciary duty. Under Instruction No. 22, the jury only had to find that Robert and Linda had breached their fiduciary duty in one of seven possible ways. Interference with the nine existing or prospective business relationships was only one way that the jury may have decided that they had breached their fiduciary duty. Thus, the jury may have assessed damages for Robert and Linda's acts of "failing to properly support, assist and help plaintiff as a Sales Franchisee," or because the jury found that Robert and Linda "[e]ncourag[ed] CWI to declare Mr. Hawkinson in default."

Instruction No. 25 accurately set out the law regarding calculation of loss of profits and future profits. It stated:

"Loss of profits to an established business occasioned by the wrongful act of another [is] compensable and you may award such amount as is proved by the evidence. Such loss of profits may be awarded as damages when they are proved with reasonable certainty and may reasonably be considered to have been within the contemplation of the parties. Absolute certainty in proving loss of future profits is not required. What is required is that the jury be guided by some rational standard."

In conclusion, the jury instructions accurately set out the law regarding calculation of damages, and it is not function of this court to assume that the jury failed to follow the instructions. The trial judge did not abuse his discretion when he allowed Hawkinson to testify concerning past and future loss of profits, nor was it error to submit Hawkinson's claims for loss of profits and loss of future profits to the jury.

## VI. THIRD-PARTY BENEFICIARY

The trial judge determined that Hawkinson, as a matter of law, was a third-party beneficiary of the Master Franchise Agreement between Robert and Linda and CWI. He framed the issue as whether the parties to the Master Franchise Agreement, Robert

and Linda and CWI, intended to benefit Hawkinson, a franchisee, in a direct nonincidental manner.

The judge cited *Parrish Chiropractic v. Progressive Cas.*, 874 P.2d 1049, 1056 (Colo. 1994), as the controlling authority on this issue. The *Parrish* court stated:

"A person not a party to an express contract may bring an action on the contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely an incidental benefit of the contract. [Citation omitted.] While the intent to benefit the non-party need not be expressly recited in the contract, the intent must be apparent from the terms of the agreement, the surrounding circumstances, or both. [Citation omitted.]"

The trial court explained that determination of the intent of the parties to a contract is a question of contract construction for the court. See *Martin v. Edwards*, 219 Kan. 466, 473, 548 P.2d 779 (1976). The trial court stated:

"While a court should be cautious in granting summary judgment where the issues of the case involve questions of the intent of the parties, summary judgment is nevertheless proper where the intent, as here, is clearly expressed in the contract and no fact question concerning the intent of the parties is presented. *Noller v. General Motors Corp.*, 244 Kan. 612, 617, 772 P.2d 271 (1989)."

The trial court used the same standard it applied in determining whether Robert and Linda were third-party beneficiaries in deciding whether Robert and Linda and CWI, as the parties to the Master Franchise Agreement, intended to benefit Hawkinson, a franchisee, in a direct nonincidental manner. The trial court noted Article 7 of the Master Franchise Agreement sets out the obligations of the Master Franchisee.

"Among those obligations, the Master Franchisee promises by paragraph c:

" . . . to maintain suitable office space for the Business Telephone Center (B.T.C.). The B.T.C. will provide administrative and marketing support for the Master Franchisee and for those Franchises that are established in the Master Franchise area."

"Article 2 of the Master Franchise Agreement makes clear the intent of the parties:

"The demonstrations systems initially installed in the Business Telephone Center are for the use of the Sales Franchisees and sales people in the Master Franchisee's territory . . . ."

The trial court determined as a matter of law that by the Master Franchise Agreement, CWI and Robert and Linda, as parties to the Master Franchise Agreement, intended to directly benefit a nonparty. A sales franchisee, such as Hawkinson, was such a nonparty. Consequently, the judge denied Robert and Linda's motion for summary judgment, wherein they claimed that Hawkinson was not a third-party beneficiary.

The judge provided sound analysis and applied appropriate facts to support his finding that, as a matter of law, Hawkinson was a third-party beneficiary of the Master Franchise Agreement. Therefore, there was no error and this issue fails.

## VII. JURY MISMANAGEMENT AND JURY MISCONDUCT

Robert and Linda argue that the cumulative effect of jury mismanagement and jury misconduct requires a new trial. They contend that the trial court erred in "secretly" instructing the jury as to the meaning of the word "tortious" and in failing to admonish the jury prior to its overnight separation. Further, the jury committed misconduct in consulting outside sources as to the meaning of the word "tortious."

### A. Claims of judicial misconduct

"Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. A mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial." *State v. Gadelkarim*, 256 Kan. 671, Syl. ¶ 1, 887 P.2d 88 (1994).

See *State v. Plunkett*, 257 Kan. 135, Syl. ¶ 2, 891 P.2d 370 (1995).

During deliberations, the jury sent the court a note asking: "tortiously - what does that mean." The judge sent the following note back to the jury, without giving notice to counsel:

"November 8, 1995
3:42 p.m.
The use of that word is explained in instructions numbered 18 and 20.
Those describe and define tortious interference."

K.S.A. 60-248(e) provides:

"If, after the jury has retired for deliberation, it desires further information as to any part of the law or evidence pertaining to the case, it may communicate its request through the bailiff to the court in the manner directed by the court, following which the court, after notice to counsel for the parties, may consider and make such provision for a response to the request of the jury as the court finds to be required under the circumstances."

In *Howard v. Miller*, 207 Kan. 246, 485 P.2d 199 (1971), the jury asked the judge whether an error in judgment was negligence, by way of a note handed to the bailiff. The exact form of the question was impossible to discern, as was the response from the judge because there was no record made of the question or the answer. Further, the judge never gave notice to the parties and counsel for the plaintiff learned of the communication after the jury had returned its verdict. In 1971, however, K.S.A. 60-248(e) (Corrick) provided:

"'After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of law shall be given, or the evidence shall be read or exhibited to them in the presence of, or after notice to, the parties or their counsel.'" *Howard*, 207 Kan. at 249.

Robert and Linda cite *Howard* because the court ruled that plaintiff, who lost, should be granted a new trial. The *Howard* court ruled that

"the question of contributory negligence was crucial to plaintiff. The private instruction may or may not have borne on this issue and its giving may or may not have affected the result. We do not know and because we are unable, from examination of the entire record, to declare the error harmless we must hold it to be reversible error and ground for a new trial." 207 Kan. at 252.

Hawkinson cites *Howard* as authority for the following statement:

"Our cases [on private communication between judge and jury] appear to fall in two categories. First, in instances in which the facts were fully disclosed and all that was communicated by the judge to the jury was set forth in the record, and it affirmatively appeared no prejudice resulted from the communication, the irregularity was held not to be reversible error." 207 Kan. at 249.

The communication from the judge did nothing more than refer the jury to other instructions for the definition of "tortious." The

judge erred in failing to provide notice to counsel as mandated by statute, but under the facts and circumstances of this case the error did not prejudice defendants. Thus, the error was harmless.

Robert and Linda further assert that it was prejudicial error for the judge to fail to admonish the jury after the first day of deliberations in violation of K.S.A. 60-248(d). K.S.A. 60-248(d) states:

"If the jurors are permitted to separate, either during the trial or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with, or allow themselves to be addressed by, any other person on any subject of the trial; that it is their duty to keep an open mind and not to express an opinion on the subject of the trial until the case is finally submitted to them; and that the admonition applies to every separation of the jurors."

During the first day of trial the judge gave the jury the following admonition:

"Ladies and Gentlemen, we'll take our afternoon recess at this time. Keep in mind the admonition that I discussed with you earlier today. During this recess you will please not confer about this case with any other person, nor allow any other person to discuss the case with you. You will please not express any opinion about the case or form any fixed opinion until the case is finally submitted to you."

At the end of the second day of trial, the trial judge admonished the jury prior to sending it to lunch. Also, on the second day of trial, before dismissing the jury for the evening, the judge told the jury to "[k]eep in mind the admonition that I've given you." The judge recessed the jury until 1:30 p.m. on November 7, 1995. On November 7, the jury heard closing arguments and began deliberation. Gordon Rock's affidavit states that "[w]hen the jury retired after the first day of deliberations, no notification was furnished to me by the court that they were ceasing deliberations for that day." Rock also attests that court was not reconvened for the purpose of excusing the jury overnight and "[n]o admonition was given to the jury after the first day of deliberations prohibiting them from discussing the case or their deliberations with others, or not to consult outside authorities regarding these deliberations." Further, he states that

"[a]fter the first day of deliberations, the jury was simply allowed to separate and disperse without admonition. Several of the jurors had already left the courtroom

and several were filtering out of the courtroom, when it was discovered that the jurors had been separated and excused for the day."

The jury reached a verdict on November 8, 1995.

When the trial judge erred by failing to admonish the jury on one occasion in *State v. Ralls*, 213 Kan. 249, 515 P.2d 1205 (1973), we affirmed the case. In *Ralls*, K.S.A. 22-3420(2) (Weeks), the criminal statute on admonition, applied. K.S.A. 22-3420(2) is the same as the 1972 version and nearly identical to the civil version of the statute. K.S.A. 22-3420(2) provides:

> "If the jury is permitted to separate, either during the trial, or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with, or allow themselves to be addressed by any other person on any subject of the trial, and that it is their duty not to form or express an opinion thereon until the case is finally submitted to them, and that such admonition shall apply to every subsequent separation of the jury."

In *Ralls*, the judge failed to admonish the jury immediately prior to their deliberations. Defendant claimed that the court was required to admonish the jury at every separation and failure to do so entitled him to a new trial. The *Ralls* court stated that it would be better practice to admonish the jury at each separation, but held that "prejudicial error will not be presumed from one such failure in the absence of a showing of prejudicial misconduct on the part of the jurors resulting therefrom. No prejudice or misconduct appears in the record of this case." 213 Kan. at 255. We hold substantial prejudice has not been shown.

## B. Claims of jury misconduct

According to Robert and Linda, one juror consulted a dictionary and another juror consulted an outside attorney as to the meaning of "tortious." Both jurors communicated their findings to the jury panel.

In *State v. Goseland*, 256 Kan. 729, 887 P.2d 1109 (1994), the appellant contended that a juror's consulting a dictionary for a definition of "reasonable" was ground for a new trial. The district court determined that appellant had not provided evidence from which it could be concluded that his rights were substantially prejudiced. The evidence "presented to the district court was an affidavit of

Goseland's trial counsel 'detailing his conversation with the juror as well as another juror.' " 256 Kan. at 735. The *Goseland* court noted:

" 'In recent years, this court has consistently adhered to the rule in both civil and criminal cases that juror misconduct is not a ground for reversal, new trial, or mistrial unless it is shown to have substantially prejudiced a party's rights. The party claiming prejudice has the burden of proof.' " 256 Kan. at 735 (quoting *State v. Fenton*, 228 Kan. 658, Syl. ¶ 1, 620 P.2d 813 [1980]).

The record before us does not contain sufficient proof that Robert and Linda were substantially prejudiced by the alleged misconduct.

## VIII. BREACH OF CONTRACT

Robert and Linda claim that the trial court erred in submitting Hawkinson's claim for tortious interference with his existing Sales Franchise Agreement with CWI because the instruction permitted the jury to impose liability without finding that CWI had breached the contract. In *Dickens v, Snodgrass, Dunlap & Co.*, 255 Kan. 164, 169, 872 P 2d. 252 (1994), the court delineated the elements necessary to prove tortious interference with a contract as: "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom." Robert and Linda further argue there was insufficient evidence to support the third, fourth, and fifth elements of the tort, as well as insufficient evidence of their malicious conduct. In addition to the five elements, "[a]n action for tortious interference with a contract is predicated on malicious conduct by the defendant." *Dickens*, 255 Kan. 164, Syl. ¶ 1.

Instruction No. 17 stated that "[p]laintiff's second claim is that the defendants tortiously interfered with plaintiff's contract with Communications World International by defendants' intentional efforts to obtain the termination of plaintiff's Sale Franchise Agreement, and by encouraging Communications World International to declare plaintiff in default." Instruction No. 18 explained that in order for plaintiff to recover for tortious interference with a contract, the defendants must have induced the breach of the contract with actual malice. The instruction noted that "as used in

this instruction, 'actual malice' means actual evil-mindedness or special intent to injure." Instruction No. 21 set out the defense of justification.

As the issues already analyzed have shown, Hawkinson established sufficient evidence for all of the elements of this tort, except for an *actual* breach of his contract with CWI. The ultimate issue becomes whether CWI's notice of default letter was a constructive breach which satisfies the element of breach for the tort, or whether the trial court improperly submitted this instruction, because CWI never actually terminated Hawkinson's sales franchise.

The October 8, 1992, letter stated that it was impossible for CWI to offer him "the opportunity to participate in the new franchise program in the Kansas City area at this time." The letter also stated that "it is apparent that it is not in the best interest of any of the involved parties to attempt to maintain the franchise relationship as reflected by your current Agreement. If that relationship was working and if it was your desire to do so, CWI would continue to honor the Agreement." Other pertinent language of the October 8 letter includes: "CWI would like to offer you the right to cancel your Agreement with CWI," and "CWI regrets that the proposed resolution to this matter must necessarily involve the suggestion that your franchise be cancelled," and "[i]n accordance with Article 12 of the Agreement, CWI is entitled to terminate the Agreement twenty (20) days from your date of receipt of this letter. However, CWI will delay enforcing its contractual right to terminate the Agreement and will instead use the next thirty (30) day period, as stated above, to seek an alternative resolution to this matter."

On January 14, 1993, Hawkinson filed a petition for damages and injunctive relief in the District Court of Johnson County, Kansas. On January 14, 1993, the district court entered a restraining order against CWI, Robert and Linda, Southwest, West, and all others acting in concert or petition with them, "[t]o cease and desist and be enjoined from terminating the Franchise Agreement or from directly or indirectly denying Plaintiff the benefits of the Franchise Agreement." Hawkinson and CWI entered into arbitration proceedings for 3 days in late August 1993, and 3 more days in late September 1993. The arbitrator entered a judgment and an

award on November 10, 1993, and such award and judgment were incorporated by reference and confirmed in its entirety by the Johnson County District Court on February 18, 1994. Hawkinson was awarded $35,635.67 against CWI and he was "determined to be an 'eligible existing Franchisee' and may elect, without charge, to take advantage of the opportunity to participate in the new franchise program."

Robert and Linda rely on *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154 (D. Kan. 1990), as authority that a claim for tortious interference with an existing contract does not stand unless there is a true breach. At oral argument, counsel insisted that *Pizza Management, Inc.* mandated reversal of the judgment against Robert and Linda. *Pizza Management, Inc.* involved a suit brought by a franchisee against franchisor and was decided by applying Kansas law. The case came before the court on defendants' (Pizza Hut, Inc.) (PHI) motion to dismiss. "In deciding a motion to dismiss, the court must accept as true on their face the well-pleaded factual allegations in the complaint and all reasonable inferences are drawn in favor of the plaintiffs. [Citation omitted.]" 737 F. Supp. at 1157. Further, "[t]he sufficiency of the complaint is not assessed from whether the plaintiff may ultimately prevail but from whether plaintiff is entitled to present evidence in support of its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)." 737 F. Supp. at 1157.

The *Pizza Management, Inc.* court granted defendants' motion to dismiss plaintiffs' claim of tortious interference with a contract, but it did not set down the "cast in stone" rule alleged by Robert and Linda. Plaintiffs (PMI) alleged that in May 1986, they negotiated with John Finerty to acquire his outstanding stock in the "Pizza Hut" franchise in Spain, and reached an agreement with Finerty to accomplish the sale. PMI alleged that

"verbal approval from PepsiCo was obtained before the acquisition agreements were executed and that in reliance upon this approval they closed the purchase with Finerty and took over management of the franchise. PMI asserts it sought, during the closing of the stock transaction, written confirmation of the prior verbal approval, but PepsiCo denied the request." 737 F. Supp. at 1163.

Thus, plaintiffs seek relief on the theory, among others, that PepsiCo's denial of formal written confirmation of consent constitutes interference with the contract between PMI and Finerty. 737 F. Supp. at 1163.

Plaintiffs admit that Finerty did not breach his contract with PMI but aver that PepsiCo's refusal to consent to the sale damaged PMI because it interfered with Finerty's performance. The *Pizza Management, Inc.* court referred to its April 14, 1989, order, wherein it dismissed PHI's claim against PMI for tortious interference with its agreements with other franchisees. The court noted that

"[c]iting *George A. Fuller Co. v. Chicago Col. of Ost. Med.*, 719 F.2d 1326, 1330 n. 1, 1331 (7th Cir. 1983), this court held: '[a]bsent persuasive indicia that the Kansas Supreme Court would extend an action of interference with contract to any adverse impact or increased burden, short of a breach, this court will not do so.' [Citation omitted.]" 737 F. Supp. at 1164.

Under Kansas law, anticipatory repudiation is a breach of contract. In *Wilson v. National Refining Co.*, 126 Kan. 139, 266 Pac. 941 (1928), a lessee abandoned the leased premises and refused to pay rent for approximately 2 years of a 5-year lease. Lessor brought an action to recover damages for breach 5 months before the lease expired and lessee claimed that such action was premature. The *Wilson* court stated:

"'Where there has been a renunciation of an executory contract by one party, the other party has a right to elect between the following remedies: (1) To rescind the contract and pursue the remedies based on such a recision. (2) To treat the contract as still binding and wait until the time arrives for its performance, and at such time to bring an action on the contract for breach. (3) To treat the renunciation as an immediate breach and sue at once for any damages he may have sustained.' (13 C.J. 653)" 126 Kan. at 140.

Here, we hold that CWI breached the contract by improperly declaring Hawkinson in default of the contract and forcing him to arbitrate to prevent the termination of his contract, and that under the rules of anticipatory repudiation, he could treat this situation as an immediate breach of the contract.

Robert and Linda also claim that Hawkinson did not present sufficient evidence of malice. The arbitration proceedings were

admitted into evidence and the findings set out in that judgment clearly support that Robert and Linda acted with malice. Among other findings supporting malice on the part of Robert and Linda, the arbitrator found:

"The Master Franchisee was a 'family affair' in that Robert and Linda Bennett (husband and wife) were involved as the Master Franchisee, both Bennett's initially had their own individual Franchises under the Master; Stormy Bennett (Bob's brother) had another Franchise under the Master; another of Bob's brothers was initially involved with Stormy; and, the key employees of the Master were intertwined - Sharon and Karen are sisters, Cindy is a roommate of Karen, and the Bookkeeper (Pam Meek) is the sister-in-law of Sharon. Over the years, all 'non-family' franchisees, people such as Hawkinson, dropped out of the Kansas City Master Franchise except for Hawkinson. The Bennetts have no desire or intent to add to their Master Franchise any additional Franchisees; and, the Bennetts have a strong desire to remove Hawkinson from the system."

These findings, in combination with letters that Robert and Linda wrote to CWI, show the element of malice. This issue fails.

## IX. FIDUCIARY DUTY

Robert and Linda contend that the trial judge should have made the determination of whether a fiduciary relationship existed. They assert that a fiduciary duty is a question of law. Given Robert and Linda's unique position as Master Franchisee, it was not error for the trial court to submit the question of whether a fiduciary duty existed to the jury.

In Robert and Linda's own motion for summary judgment, they asserted a claim that they were third-party beneficiaries of the CWI/Hawkinson Agreement. In support of this argument, they argued that the sales franchisees were responsible for supplying the Master Franchisee detailed account records and for paying a royalty fee. "Further, the Bennetts point out that Hawkinson [was required to] pay the Master Franchisee for all equipment he purchases, order all products and installation work or service calls through the Master Franchisee, and pay the Master Franchisee a monthly fee for the business telephone center." Although, Robert and Linda made this argument in terms of the third-party beneficiary claim, their own arguments support that they had a fiduciary relationship to Hawkinson.

Further, not only did Robert and Linda fail to provide the services that they were obligated to provide Hawkinson, they wrote numerous letters to CWI urging CWI to terminate Hawkinson's franchise.

Robert and Linda contend that a fiduciary obligation was not tied to any specific provision in the contract. They argue that the only provision in the Master Franchise Agreement allowed into evidence was Article 9(c) and that a fiduciary relationship is not established by Article 9(c). ("The Master Franchisee is encouraged to recruit salespeople who can develop to become Sales Franchisees, but the activities of the salespeople must not detract from the results of the Sales Franchisees nor hinder the Sales Franchisees from generating sales for their own account. The Master Franchisee will be responsible for insuring that conflicts do not arise between expansion and the rights of the Sales Franchisees.")

Even if Robert and Linda's obligation is not tied to a specific clause of the contract, Hawkinson, nevertheless, has a valid claim that a fiduciary relationship existed because of the overall intent of the CWI/Robert and Linda Master Franchise Agreement. One of the purposes for establishing a Master Franchisee was for the Master Franchisee to help the sales franchisees. In exchange for helping the sales franchisees, the sales franchisees were obligated through their Agreements with CWI to pay the Master Franchisee.

Robert and Linda each owed Hawkinson a fiduciary duty because they both signed the Master Franchise Agreement and they both conducted business as if they were partners in the Master Franchise. Hawkinson presented sufficient evidence that Robert and Linda jointly breached their fiduciary duty. Robert and Linda argue that because one or the other did not deal with some of the alleged business relationships, there was insufficient evidence to submit a claim for damages against them for those business relationships. As fiduciaries, however, they owed Hawkinson the utmost duty of fair dealing and good faith and even if Robert and/or Linda did not deal with a business entity, under the Master Franchise Agreement they were responsible for one another's acts. Thus, it is unnecessary to examine each business entity individually

and determine whether Linda and/or Robert had any dealings with that entity.

Further, the jury did not have to find that Robert and Linda breached a fiduciary duty in all of the possible ways proposed in Instruction No. 22. The instruction stated that the jury had to decide if Robert and Linda had breached a fiduciary duty in one or more of the ways listed. There was clearly sufficient evidence that Robert and Linda sought the termination of Hawkinson's sales franchise and that they encouraged CWI to declare Hawkinson in default.

## X. PUNITIVE DAMAGES

Robert and Linda assert that Hawkinson's claim for tortious interference with prospective business relations was redundant with his contract claim and, consequently, it was an improper basis for the claim of punitive damages. Further, they contend that there was insufficient evidence to support submitting the issue of punitive damages against both Robert and Linda to the jury.

### A. Standard of review

"Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993).

### B. Sufficiency of evidence

In *Smith v. Printup*, 262 Kan. 587, 596, 938 P.2d 1261 (1997), the court stated:

"Prior to the enactment of K.S.A. 60-3701 and 60-3702, which places the calculation of the amount of punitive damages with the trial court instead of a jury, we applied an abuse of discretion standard when reviewing a punitive damages award. [Citations omitted.]" The *Smith* court further explained:

"Subject to the provisions of K.S.A. 60-3701, the standard of review remains one of abuse of discretion. We must first determine whether the provisions of K.S.A. 60-3701 have been applied by the trial court in setting the amount of punitive damages. Once that determination has been made, the amount awarded will be set aside only upon a showing that the trial court abused its discretion, which is another way of saying that the action of the trial court was arbitrary, capricious, or unreasonable. See *Ensminger v. Terminix Intern. Co.*, 102 F.3d 1571 (10th Cir. 1996). We also have stated that '[w]hen determining the amount of punitive damages to be awarded under K.S.A. 1992 Supp. 60-3701, it is incumbent on the trial court to make sufficient findings of fact to afford meaningful appellate review thereof.' [Citing *Gillespie v. Seymour*, 253 Kan. 169, Syl. 1, 853 P.2d 692 (1993) (*Gillespie II*).]" 262 Kan. 597.

Instruction No. 26 stated:

"In connection with his claims of breach of fiduciary duty, tortious interference with contract and tortious interference with prospective business relations, the plaintiff claims the defendants Robert and Linda Bennett acted in a willful, wanton or malicious manner toward plaintiff entitling him to punitive damages in addition to actual damages. If you find the plaintiff is entitled to recover actual damages for any one or more of those three claims, then you may consider whether punitive damages should also be allowed. Punitive damages may be allowed in the jury's discretion to punish a defendant and to deter others from like conduct.

"In order for the plaintiff to be entitled to punitive damages the burden is on the plaintiff to prove by clear and convincing evidence that the actions of the defendants Robert and/or Linda Bennett with respect to one or more of those three claims were willful, wanton or malicious. Clear and convincing evidence means evidence that is certain, unambiguous and plain to the understanding and so reasonable and persuasive as to cause you to believe it.

"If you find that the defendants Robert and/or Linda Bennett did one or more of the acts referred to above claimed by the plaintiff and find that plaintiff is entitled to actual damages, you should then determine whether clear and convincing evidence has been presented that the defendants, or either of them, did one or more of those acts in a willful, wanton or malicious manner. If you make the determination it has been, you may decide whether punitive damages should be allowed against either or both defendants and your finding should be entered on the verdict form. After the trial the court will conduct a separate hearing to determine the amount of punitive damages to be allowed."

The jury determined that both Linda and Robert had acted in a willful, wanton, or malicious manner toward Hawkinson on one of Hawkinson's claims of breach of fiduciary duty, tortious interference with a contract, and tortious interference with prospective business relations. It is impossible to know on which of these claims

the jury based its decision, but there was clearly sufficient evidence to support punitive damage against Robert and Linda in connection with at least one of the three claims, if not all claims. Thus, it was not error to submit this instruction.

## C. Tortious interference and contract claim

Even if Hawkinson's claim for tortious interference with prospective business relations was redundant of his contract claim, the jury may have decided punitive damages were appropriate for a reason other than tortious interference with prospective business relations, or the contract claim involving interference with prospective business relations. Instruction No. 26, as set out above, allowed the jury to consider punitive damages upon a finding that plaintiff was entitled to recover actual damages for any one or more of the three claims of breach of fiduciary duty, tortious interference with a contract, and tortious interference with prospective business relations.

Thus, the jury may have found that Hawkinson was entitled to punitive damages only due to Robert and Linda's breach of fiduciary duty. The jury was only required to find one reason for awarding punitive damages. Therefore, Robert and Linda's claim under this issue fails.

We have examined appellants' arguments and do not find reversible error either individually or combined.

Affirmed.